[793 NYS2d 356]

FOR THE PEOPLE THEATRES OF N.Y., INC., Doing Business as FAIR THEATRE, et al., Respondents, v CITY OF NEW YORK et al., Appellants.

TEN'S CABARET, INC., Formerly Known as STRINGFELLOW'S OF NEW YORK, LTD., et al., Respondents, v CITY OF NEW YORK et al., Appellants.

First Department, April 12, 2005

**APPEARANCES OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City (*Elizabeth S. Natrella, Leonard Koerner* and *Robin Binder* of counsel), for appellants.

*Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP*, New York City (*Herald Price Fahringer* and *Erica T. Dubno* of counsel), for For the People Theatres of N.Y., Inc. and another, respondents.

*Alonso, Andalkar & Kahn, P.C.*, New York City (*Mark J. Alonso* of counsel), for Ten's Cabaret, Inc., respondent.

*Mehler & Buscemi*, New York City (*Martin P. Mehler* of counsel), for Pussycat Lounge, Inc., and others, respondents.

### OPINION OF THE COURT

NARDELLI, J.

In these appeals, which we consolidate for disposition, we are asked to review two judgments of the Supreme Court, New York County (Louis B. York, J.) which, inter alia, granted plaintiffs' motions for summary judgment in each action, declared the 2001 Adult Use Amendments to the 1995 Adult Use Zoning Ordinance unconstitutional, and permanently enjoined the municipal defendants from enforcing those amendments.[1]

Plaintiffs are "adult" establishments within the City of New York which offer various forms of sexually oriented expression, and include bookstores, theaters, video stores and eating and drinking establishments which provide live entertainment, such as nude or topless dancing.[2] The municipal defendants include the City of New York, Michael R. Bloomberg, as Mayor of the City of New York, Amanda M. Burden, as Director of City Planning for the Department of City Planning of the City of New York, and Patricia Lancaster, as Commissioner of Buildings, Department of Buildings of the City of New York.

The adult entertainment industry, in the mid-1960s, began a period of rapid expansion. New York City, in 1965, had only nine such establishments within its five boroughs, but by 1993, that number had mushroomed to 177. In response, the New York City Department of City Planning (the DCP), in September 1993, undertook an "Adult Entertainment Study" (the DCP Study) to ascertain the impact of adult establishments on the quality of urban life, and to assist the City Planning Commission (the CPC) in determining whether to adopt specific zoning regulations aimed at adult property uses, a measure that had already been undertaken by a number of other municipalities.

---

**1.** Initially, the municipal defendants sought to appeal the judgments directly to the Court of Appeals, as of right, pursuant to CPLR 5601 (b) (2), but that Court, sua sponte, transferred the matters to this Court upon the ground that a direct appeal does not lie when questions other than the constitutional validity of a statutory provision are involved (*see Ten's Cabaret v City of New York*, 1 NY3d 592 [2004]; *For the People Theatres of N.Y. v City of New York*, 1 NY3d 590 [2004]).

**2.** The United States Supreme Court has held, on more than one occasion, that nude and topless dancing, like other forms of adult expression, are entitled to First Amendment protection (*see e.g. Schad v Mount Ephraim*, 452 US 61 [1981]).

The DCP Study, which was released in September 1994, initially examined the impacts found, through similar studies, in nine other localities: Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; the State of Minnesota; Manatee County, Florida; and New Hanover County, North Carolina. The DCP concluded that these reports indicated that adult entertainment uses have negative secondary impacts, including increased crime rates, depreciation of property values, and the deterioration of community character and the quality of urban life (*see Stringfellow's of N.Y. v City of New York*, 91 NY2d 382, 390-392 [1998]).

The DCP, with respect to New York City, reviewed earlier studies of adult establishments, including: a 1977 report by the CPC; the 1983 Annual Report of the Mayor's Office of Midtown Enforcement; a 1993 Chelsea Action Coalition and Community Board 4 study; testimony given at an October 1993 public hearing held by the Manhattan Task Force on the Regulation of Sex-Related Businesses; and an April 1994 study by the Times Square Business Improvement District. The DCP also conducted its own analysis of adult entertainment uses in six targeted study areas within New York City[3] and, based upon the abundance of information before it, concluded that adult entertainment establishments, especially in areas marked by high concentrations of those businesses, produce negative secondary impacts, including increased crime rates, property value depreciation, deterioration of community character and quality of life, and a reduction in commercial activity. The DCP, therefore, recommended that adult establishments be regulated differently from other commercial establishments because of the above-cited adverse effects, and that restrictions should be placed on the proximity of adult uses to residential areas, schools, houses of worship and other adult establishments.

The New York City Council subsequently imposed a one-year moratorium on the creation or expansion of adult-use establishments, effective November 1994. In the accompanying report, it was noted that the moratorium was being adopted as a result of the DCP findings, and that the one-year period was to allow sufficient time for the DCP to develop permanent regulations. In March 1995, the DCP and the City Council Land Use Committee filed a joint application to amend the zoning law in order

---

**3.** Manhattan Community Districts 4 and 5; Manhattan Community District 7; Bronx Community District 5; Brooklyn Community District 7; Queens Community District 2; and Staten Island Community District 2.

to establish a permanent and comprehensive set of regulations applicable to adult establishments.

The CPC and the City Council thereafter conducted public hearings and received comments from the City's five borough boards and 59 community boards, and on September 18, 1995, the CPC approved the proposed amendments. On October 25, 1995, following additional public hearings, the City Council adopted the permanent restrictions (Text Amendment N 950384 ZRY), effective immediately (the 1995 Ordinance).

The 1995 Ordinance does not prohibit the operation of any specific classification of establishment but, rather, has at its core a set of locational restrictions and anticoncentration provisions. An adult establishment was defined as

> "a commercial establishment where a 'substantial portion' of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (Amended Zoning Resolution of City of New York [AZR] former § 12-10).

Commercial establishments fell within one of the foregoing categories if they "regularly feature[d]" or devoted a "substantial portion" of their stock-in-trade to entertainment or material that was "characterized by an emphasis on" "specified anatomical areas" or "specified sexual activities" (*id.*). The 1995 Ordinance provided that the following factors were to be considered in determining whether a facility fell within the zoning restrictions:

> "(1) the amount of floor area and cellar space accessible to customers and allocated to [adult] uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to [adult] uses as compared to the total floor area and cellar space accessible to customers in the establishment" (*id.*).

With regard to the term "substantial portion," which was left undefined in the 1995 Ordinance, and which was to engender a fair amount of confusion, the Court of Appeals, in *City of New York v Les Hommes* (94 NY2d 267, 271 [1999]), noted that:

> "In response to an inquiry as to what constitutes a 'substantial portion,' the City Department of Buildings issued Operations Policy and Procedure Notice (OPPN) No. 4/98, and several weeks later superseded it with OPPN No. 6/98. Both imposed similar

guidelines 'to clarify the meaning of the phrase "substantial portion" ' (Dept of Buildings, Operations Policy and Procedure Notice No. 6/98, Aug. 13, 1998). With respect to 'adult establishments' generally, if 'at least 40 percent of the floor and cellar area that is accessible to customers [is] available for adult' use, then a 'substantial portion' of the business is devoted to adult use within the zoning resolution. In any event, if '10,000 or more square feet of a commercial establishment . . . is occupied by an adult use, the commercial establishment is deemed to be an "adult establishment" regardless of the overall size of the establishment.' "

The 1995 Ordinance also provided that adult establishments were barred from certain districts, including residential districts and districts zoned for manufacturing and commercial use, but which also permitted residential development (AZR §§ 32-01, 42-01). In those districts where adult uses were authorized, the adult establishments had to be located at least 500 feet from churches, schools, day care centers, other adult uses, and zoning districts which permitted residential development (*id.*).

In 1996, a group of adult establishments, including Stringfellow's of New York, Ltd., the predecessor to plaintiff Ten's Cabaret, Inc., launched a constitutional challenge to the 1995 Ordinance, asserting claims for violation of freedom of expression under the New York Constitution and the Constitution of the United States. The New York State Court of Appeals, in upholding the constitutionality of the 1995 Ordinance, held, inter alia, that "we agree with the courts below that enactment of the Amended Zoning Resolution was not an impermissible attempt to regulate the content of expression but rather was aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose" (*Stringfellow's of N.Y. v City of New York*, 91 NY2d at 399 [1998]), and that the 1995 Ordinance was no broader than necessary, and constituted a sufficiently narrow "regulatory scheme designed to attack the problems associated with adult establishments. By preventing adult businesses from locating in potential residential districts while allowing such establishments to locate in manufacturing and commercial districts, the amendments protect only those communities and community institutions that are most vulnerable to their adverse impacts" (*id.* at 400). Finally, the Court opined that the 1995 Ordinance was applicable even to establishments that can legitimately claim they did not contribute to

urban blight since " '[t]he validity of a statute . . . is not to be determined from its effect in a particular case, but upon its general purpose and its effect to that end' " (*id.* at 401, quoting *City of Rochester v Gutberlett*, 211 NY 309, 316 [1914]).

The City, beginning in July 1998, commenced what it terms a "comprehensive enforcement initiative" of the 1995 Ordinance which, with little or no surprise, spawned additional litigation.[4] In one nuisance abatement action, the City asserted that despite the fact that certain defendant establishments had augmented their stock of nonadult videos so that it constituted more than 60% of their total video stock, it did little to alter the "essential nature" of the businesses' preexisting, nonconforming stock-in-trade, i.e., a sexually oriented adult establishment, as these stores still did more than 40% of their business in adult videos. While Supreme Court and this Court agreed with the City (*City of New York v Les Hommes*, 258 AD2d 284 [1999], *revd* 94 NY2d 267 [1999]), the Court of Appeals disagreed and held that a plain reading of the language employed by the City in the 1995 Ordinance, and the fact that such language must be construed in favor of the property owner and against the municipality which adopted and seeks to enforce it, does not permit an inquiry into what inventory is selling.

> "Instead, the focus is solely on the appropriate percentages of stock and floor and cellar space, and the City drew these at 40%. As a result, the City's guidelines provide no support for the view that profitability or stability of the nonadult stock need be considered." (94 NY2d at 273.

In *City of New York v Dezer Props.* (95 NY2d 771 [2000]), the Court of Appeals further found that the "substantial portion"

---

4. At least one attempt to avoid the application of the 1995 Ordinance, in our view, bordered on the absurd. In that case, Stringfellow's, an "eating or drinking establishment" which featured, inter alia, topless dancing, sought to circumvent the 1995 Ordinance by adopting a policy under which it purported to admit minors pursuant to an elaborate, eight-point protocol, which included contacting an attorney for Stringfellow's, on an admission-by-admission basis, and obtaining a sworn release from the minor's parents. The Court of Appeals frowned upon Stringfellow's policy and opined that "the minors policy represents Stringfellow's attempt 'to avoid both the restrictions of the [1995 Ordinance] as well as any potential criminal liability'. In essence, it reflects an impossible tightrope walk between the [1995 Ordinance] and the Penal Law: If children are not customarily admitted, the establishment is subject to the [1995 Ordinance]. If children are customarily admitted, the management risks criminal prosecution" (*City of New York v Stringfellow's of N.Y.*, 96 NY2d 51, 56 [2001] [citation omitted]).

component of the 1995 Ordinance also applied to eating and drinking establishments.

In response to the foregoing setbacks, the DCP, in March 2001, filed an application with the CPC to amend the 1995 Ordinance, noting therein that enforcement efforts since 1998 have pointed to a need to adjust the regulations to address attempts by adult establishments to remain in operation through superficial measures which do not alter the character of the establishments as enterprises with a "predominant on-going focus on sexually explicit materials or activities." In addition, several court rulings had narrowed the scope and application of the 1995 Adult Use Zoning Ordinance in a manner which the DCP believed to be contrary to its original intent, thus requiring further amendments.

The proposed amendments, which are the genesis of this appeal, deleted the phrase "substantial portion" from the definition of "adult establishment," which would then be defined as:

> "a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, as defined below."

The amendments defined an "adult eating or drinking establishment" as "an eating or drinking establishment which regularly features *in any portion* of such establishment any one or more of the following:

> "(1) live performances which are characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities'; or

> "(2) films, motion pictures, videocassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas'; or

> "(3) employees who, as part of their employment, regularly expose to patrons 'specified anatomical areas'; and

> "which is not customarily open to the general public during such features because it excludes or restricts minors" (emphasis added).

An "adult theater" is defined as

"a commercial establishment which regularly features one or more of the following:

"(1) films, motion pictures, videocassettes, slides or other photographic reproductions characterized by an emphasis on the depiction or description of 'specified sexual activities' or 'specified anatomical areas'; or

"(2) live performances characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities'; and

"which is not customarily open to the general public during such features because it excludes or restricts minors.

"An adult theater shall include commercial establishments where such materials or performances are viewed from one or more individual enclosures."

The foregoing definitions, by removing any reference to the "substantial portion" qualification set forth in the 1995 Ordinance, make it clear that any eating or drinking establishments, or theaters, which regularly feature topless or nude adult entertainment, whether live or filmed, are adult establishments, notwithstanding the portion of the floor area devoted to adult entertainment.

The amendments, with regard to adult video and bookstores, retained the "substantial portion" restriction from the 1995 Ordinance, but delineated additional criteria, implicating store configuration and layout, for the purpose of determining whether a store is to be classified as an adult establishment under the "substantial portion" test. The amendments provide that nonadult material still not be considered stock-in-trade for the purposes of the "substantial portion" comparative analysis in those situations where one or more of the following features exist:

"(aa) An interior configuration and layout which requires customers to pass through an area of the store with 'adult printed or visual material' in order to access an area of the store with 'other printed or visual material';

"(bb) One or more individual enclosures where adult

movies or live performances are available for viewing by customers;

"(cc) A method of operation which requires customer transactions with respect to 'other printed or visual material' to be made in an area of the store which includes 'adult printed or visual material';

"(dd) A method of operation under which 'other printed or visual material' is offered for sale only and 'adult printed or visual material' is offered for sale or rental;

"(ee) A greater number of different titles of 'adult printed or visual material' than the number of different titles of 'other printed or visual material';

"(ff) A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with 'other printed or visual material';

"(gg) A sign that advertises the availability of 'adult printed or visual material' which is disproportionate in size relative to a sign that advertises the availability of 'other printed or visual material', when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

"(hh) A window display in which the number of products or area of display of 'adult printed or visual material' is disproportionate in size relative to the number of products or area of display of 'other printed or visual material', when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials."

The CPC subsequently held a public hearing concerning the amendments on May 23, 2001, at which time they did not enjoy widespread support. Of the 18 people who spoke at the hearing, 13 opposed the application, their primary concerns being that the amendments were unsupported by the record, unnecessary and unwarranted, overly broad in their reach, raised due pro-

cess concerns and issues of bias in enforcement, and were unfair to establishments which had already made significant expenditures to bring themselves into compliance with the 1995 Ordinance.

The CPC, on August 8, 2001, issued a report endorsing the amendments. The CPC report, inter alia, summarized the points raised by the various speakers at the public hearing, the need for, and history of, the 1995 Ordinance, the courts' "misunderstanding" and "misapplication" of the 1995 Ordinance, and the reasons the current amendments are necessary to clarify and affirm the original intent of the 1995 Ordinance.

The Zoning and Franchise Subcommittee of the Land Use Committee of the City Council held a public hearing on the amendments on October 1, 2001. David Jaffee, Counsel to the Criminal Justice Coordinator for then Mayor Rudolph Giuliani, testified that the courts, through misconstrued views and misconceptions, created loopholes in the 1995 Ordinance that adult establishments were exploiting to circumvent the zoning restrictions, rendering them meaningless. David Karnovsky, counsel to the DCP, testified that the amendments were designed to close the loopholes by establishing objective factors relating to the physical layout and method of operation for adult bookstores. The amendments were also designed to clarify the definition of an adult eating or drinking establishment in order to do away with the artificial separation of adult and nonadult sections, regardless of what portion of the establishment was devoted to each.

In recommendations forwarded to the City Council, the Borough Presidents of Brooklyn and Queens supported the ratification of the amendments, whereas the Borough President of Manhattan disapproved them, commenting that four of the seven community boards that had voted had disapproved the amendments. The record also indicates that the amendments were supported by one community board in the Bronx and one in Staten Island. On October 31, 2001, the City Council adopted and ratified the amendments.

The first action out of which these appeals arise was commenced in September 2002 by plaintiffs For the People Theatres of N.Y., Inc., a Queens movie theatre that ran adult films exclusively from 1977 until 1998, when it renovated its premises so that 60% of its customer accessible floor area featured nonadult films, in order to comply with the 1995 Ordinance, and JGJ Merchandise Corp., also known as Mixed Emotions, a

Manhattan video store that responded to the 1995 Ordinance by acquiring thousands of nonadult videotapes, removing 10 private viewing booths, and changing its name from "Peepland" (collectively referred to as FTP). A second action was commenced by Ten's Cabaret, Ltd., formerly known as Stringfellow's of New York, Ltd., a self-described restaurant, discotheque and cabaret presenting live adult entertainment, including topless female dancers. Since 1999, however, it has presented adult entertainment in less than 40% of its customer accessible area, and it notes that its configuration, and classification, as a "60/40" establishment was upheld by Supreme Court (*City of New York v Stringfellow's of N.Y.*, Sup Ct, NY County, Sept. 28, 1999, Crane, J., Index No. 403724). A third action was thereafter interposed, on or about October 18, 2002, by plaintiffs Pussycat Lounge, Inc., Church Street Café, Inc., doing business as Baby Doll, and 62-20 Queens Blvd., Inc., doing business as "Nickels eating or drinking establishments," which feature adult entertainment in less than 40% of their customer accessible floor areas. The second and third actions were consolidated pursuant to a stipulation so ordered by Justice York on May 12, 2003 (plaintiffs will collectively be referred to as Ten's).

Plaintiffs, in both actions, sought declaratory judgments declaring the amendments unconstitutional and invalid and, concordantly, permanent injunctions enjoining their enforcement. Ten's, concomitant with the commencement of its action, moved by order to show cause for a preliminary injunction barring the City from enforcing the amendments, and a temporary restraining order enjoining the implementation of the amendments pending a hearing and determination of the motion, which restraining order was granted by Justice Faviola Soto. FTP also moved for a preliminary injunction enjoining the enforcement of the amendments and the City, in response, crossmoved for summary judgment in both actions. Ten's thereafter made its own motion for summary judgment on its first cause of action, declaring the amendments unconstitutional on the ground that the City had no evidence on which it could establish that a rational basis existed for the enactment of the amendments.

The primary arguments raised by Ten's were that the City, in seeking to amend the 1995 Ordinance, failed to review, or generate, any new empirical data regarding the purported adverse secondary effects of "60/40 establishments," instead improperly relying on the same 1994 DCP report it used in support of the

original zoning restrictions; that while the City characterizes the amendments as a mere clarification of the 1995 Ordinance, they are, in fact, a drastic and unwarranted expansion thereof which would, in effect, terminate the ability of Ten's and other adult eating and drinking establishments to remain in business and display their constitutionally protected expression; and that the City Police Department's own statistical reports fail to correlate adult uses, more specifically "60/40" adult establishments, with higher neighborhood crime rates.

FTP, in support of its motion, submitted an affidavit from Elliot D. Sclar, Ph.D., a professor of urban planning and public affairs at Columbia University, who opined that the amendments constitute an impermissible micromanagement of businesses which conflict with sound zoning principles and depart from traditional zoning doctrines by converting land use into inventory control. With regard to the City's assertions concerning certain establishments being in "sham" compliance with the 1995 Ordinance, Sclar noted that he knew of nothing in the history of zoning that looks to a building owner's intent and mental state; and that the City cannot rely on studies conducted of adverse secondary effects purportedly caused by businesses which exclusively offer adult material for the purpose of justifying restrictions on "60/40" establishments, an entirely unique land use. Finally, in an effort to determine whether the presence of "60/40" uses had a negative effect on local property values, Sclar concluded that he could find no statistically significant relationship between "60/40" uses and adverse impacts on adjacent property values.

FTP also submitted an affidavit from Charles Winick, Ph.D., a criminologist who has written extensively on the subject of adult uses, in which he opined that his analysis of police statistics revealed that precincts in which "60/40" uses were located actually had fewer violent offenses reported than those without adult businesses, and that he could discern no correlation between the concentration of "60/40" uses and the violent felony rates or the number of arrests for prostitution. Further, the City Police Department's list of the 100 worst crime spots in the City found no "60/40" uses therein, and that none of the annual reports of the 59 city community boards mention "60/40" uses as a problem, or cause for concern.

The City, in support of its cross motions and in opposition to plaintiffs' motions, submitted an affidavit from DCP counsel Karnovsky, in which he stated that the Court of Appeals,

through a misreading of the 1995 Ordinance, mistakenly applied the "60/40" substantial portion test to adult eating or drinking establishments, a result that was not contemplated by the drafters. Karnovsky also opined that the amendments were designed to address the "proliferation" of book and video stores which have evaded enforcement, despite their primary focus on adult materials, by going beyond a "mechanistic analysis of stock and floor area to include additional objective criteria." Karnovsky cited the 1994 DCP report, which identified a strong body of opinion that adult entertainment uses were having negative impacts and that their further proliferation would bring about a decrease in property values and a general economic decline. Karnovsky concluded that the amendments were adopted for the purpose of clarifying and strengthening the 1995 Ordinance so as to further effectuate the legislative purpose.

The City also submitted an affidavit from Eric Kober, the Director of the Housing, Economic and Infrastructure Planning Division at the DCP, who initially took issue with the Sclar affidavit, which he claims mischaracterizes the amendments by, among other things, confusing the distinction between bulk and use regulations, both of which are included, and defined, in the amendments. Kober also refuted Sclar's position that the amendments impermissibly regulate the content of expression because the DCP did not conduct a study specifically addressed to 60/40 establishments, and averred that those establishments remain true adult establishments in nature, similar to those found in the 1993 DCP Study to cause adverse secondary impacts, negating any need for further studies. With regard to Sclar's conclusions vis-à-vis property values, Kober pointed to several flaws that he perceived permeated Sclar's analysis: there is no information indicating the source of the data regarding residential real estate transactions, i.e., the number of transactions which took place, where they took place, and whether an adequate number were analyzed; residential, rather than commercial districts were used for the study; and what controls were used.

Kober also criticized Winick's conclusions, noting that it was never suggested that a link existed between adult uses and violent felonies, although the 14th Precinct in Manhattan, which has a number of adult establishments, reported far more crimes committed against property than any other precinct in the City. Additionally, Kober explained that Winick's analysis of prostitu-

tion arrests "in the immediate vicinity" of 60/40 establishments was too restrictive, hinting that Winick did not look at precinct reports "because he knew or suspected that such an analysis would not yield a favorable result."

The motion court, by judgments entered October 14, 2003 in the *FTP* action, and October 23, 2003 in the *Ten's* action, pursuant to separate written decisions dated September 9, 2003, denied the City's cross motions for summary judgment, and granted plaintiffs summary judgment in both actions.[5] The judgments declared the amendments unconstitutional, unlawful and invalid, and permanently enjoined their enforcement.

The motion court, in parallel decisions resting upon the same reasoning, found that because the amendments regulated constitutionally protected expression, the City was required to make an evidentiary showing that there was a rational basis for their adoption. The motion court held that the City could not rely on the 1994 DCP report, and the studies contained therein, as the basis for amendments since it did not address 60/40 establishments and, as a result, could not be used as evidence to demonstrate that this particular variety of establishment caused secondary effects. The court took note that while the City, relying on the earlier studies, argued that these establishments affected surrounding areas by reducing the quality of life, lowering property values and negatively impacting the public health, safety and welfare, ultimately leading to an increase in crime, plaintiffs produced data of their own indicating that the 60/40 establishments do not cause the secondary effect of increased crime.

The motion court went on to hold that even if it were to embrace the City's claim that the amendments simply clarify the 1995 Ordinance, it would still find that the City failed to shoulder its burden of demonstrating that a broader solution was necessary and that the 60/40 establishments, which surfaced as the result of the restrictions set forth in the 1995 Ordinance, did not remedy the secondary effects identified in the 1994 DCP report.

The City appeals from both judgments and we now reverse.

The courts of this state have long acknowledged that municipalities are vested with broad power to implement land use controls and programs in order to confront the increasing

---

**5.** Although FTP did not move for summary judgment, the motion court searched the record, pursuant to CPLR 3212 (b), and awarded such relief.

encroachments of urbanization on the quality of life (*see e.g.
Asian Ams. for Equality v Koch*, 72 NY2d 121 [1988]; *Matter of
Harbison v City of Buffalo*, 4 NY2d 553 [1958]). Such restric-
tions on the use of real property "rest upon and are justified as
a proper exercise of the police power to advance the public
health, safety and welfare" (*Matter of Town of Islip v Caviglia*,
73 NY2d 544, 550 [1989]; *see also Udell v Haas*, 21 NY2d 463,
469-470 [1968]), and, as legislative enactments, they enjoy a
strong presumption of constitutionality and will be upheld if
there is a reasonable relationship between the end sought to be
achieved and the means adopted to achieve it (*Matter of Town
of Islip v Caviglia, supra* at 550-551; *McMinn v Town of Oyster
Bay*, 66 NY2d 544, 549 [1985]). Thus, if the issue is "fairly
debatable," the municipality's judgment as to the necessity of
such a regulation controls (*Matter of Town of Islip v Caviglia,
supra* at 551; *Matter of Town of Bedford v Village of Mount
Kisco*, 33 NY2d 178, 186 [1973]). The burden, therefore, on the
party attacking the regulation is to overcome that presumption
beyond a reasonable doubt (*McMinn v Town of Oyster Bay, supra*
at 548; *Northern Westchester Professional Park Assoc. v Town of
Bedford*, 60 NY2d 492, 500 [1983]).

The power to zone, as pertinent to this matter, must be
exercised in accordance with a "well considered plan" (General
City Law § 20 [25]), which plan

> "need not be contained in a single document;
> indeed, it need not be written at all. The court may
> satisfy itself that the municipality has a well-
> considered plan and that authorities are acting in
> the public interest to further it by examining all
> available and relevant evidence of the municipality's
> land use policies . . . . When a zoning ordinance is
> amended, the court decides whether it accords with
> a well-considered plan in much the same way, by
> determining whether the original plan required
> amendment because of the community's change and
> growth and whether the amendment is calculated to
> benefit the community as a whole as opposed to
> benefiting individuals or a group of individuals"
> (*Asian Ams. for Equality v Koch*, 72 NY2d 121, 131
> [1988] [citations omitted]; *see also Randolph v Town
> of Brookhaven*, 37 NY2d 544 [1975]; *Matter of Rayle
> v Town of Cato Bd.*, 295 AD2d 978 [2002]).

Initially, plaintiffs revisit their previous ill-fated argument
that there is insufficient evidence to establish a correlation be-

tween adult business and adverse secondary effects, which argument, in effect, attempts once again to disavow the 1994 DPC report, as well as the City's reliance on it. The Court of Appeals, however, in *Stringfellow's* (91 NY2d at 399-400) soundly put that issue to rest, holding that:

> "Plaintiffs' complaints about the sufficiency of the evidence on which the City Council based its decision are unpersuasive. In *Islip*, we explicitly acknowledged the value of studies from other jurisdictions (73 NY2d, at 550, 553). Further, it is clear from the comments of the CPC upon its approval of the amendments that the appropriate municipal officials considered the comparability and the reliability of the other jurisdictions' studies and found them satisfactory on both counts. As the CPC noted, 'while none of the other studies considers a municipality which duplicates New York City in terms of variety of neighborhoods and built conditions, . . . the findings of adverse secondary effects and the conditions found in these other studies are relevant to the different neighborhoods of New York City.' Plaintiffs have not offered any factual or legal basis to question that finding.

> "Moreover, the City did not rely exclusively on generic conclusions drawn from out-of-area studies but also conducted studies of its own. Contrary to plaintiffs' contentions, the 'nonempirical,' anecdotal evidence that comprised the bulk of the local studies does not render those studies worthless. In the proper context, anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects, particularly where, as here, the nonempirical information is extensive and indicative of a clear relationship between adult uses and urban decay." (Citations omitted.)

Indeed, numerous other courts, when confronted with similar zoning enactments, have, much the same as our Court of Appeals, recognized the clear, well-documented link between adult businesses and negative secondary impacts, and a municipality's entitlement, in creating such legislation, to rely on studies generated by, and the experiences of, other cities. For example, in *Renton v Playtime Theatres, Inc.* (475 US 41, 51-52 [1986]),

the Court held that "Renton was entitled to rely on the experiences of Seattle and other cities, and in particular on the 'detailed findings' summarized in the Washington Supreme Court's *Northend Cinema* opinion, in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses" (*see also Erie v Pap's A.M.*, 529 US 277, 296 [2000]; *Ben's Bar, Inc. v Village of Somerset*, 316 F3d 702, 725 [2003] [plaintiff's argument that defendant municipality may not rely on prior judicial decisions, or the experiences of other municipalities, but must instead conduct its own studies, at the local level, to determine whether adverse secondary effects result when liquor is served on the premises of adult entertainment establishments "has been expressly (and repeatedly) rejected by the Supreme Court"]; *World Wide Video of Wash., Inc. v City of Spokane*, 368 F3d 1186, 1193 [2004] ["local governments are not required to conduct their own studies in order to justify an ordinance designed to combat the secondary effects of adult businesses"]; *Hobbs v County of Westchester*, 397 F3d 133, 153 [2005]).

Plaintiffs' corollary to this argument is that because their businesses have adopted the 60/40 format, in compliance with the 1995 Ordinance, and no studies have been conducted which address this particular retail schematic, then defendants' reliance on these earlier studies to demonstrate negative secondary impacts is improper. We decline to adopt plaintiffs' premise absent a showing that the essential nature of their businesses has changed. As we noted in *City of New York v Les Hommes* (258 AD2d at 285, *revd on other grounds* 94 NY2d 267 [1999]), despite an establishment's augmentation of its nonadult video stock to more than 60% of the total stock offered for sale, "the touted increase in the stock of non-adult videos for sale has done little to alter the essential nature of the business's pre-existing, non-conforming 'stock in trade.' " Moreover, a review of the legislative record indicates that the Council reasonably believed that the nature of the 60/40 establishments, with a predominant focus on sexually explicit materials and/or featuring topless or nude women, remained unchanged, and that the 2001 amendments were necessary to effectuate the original legislative purpose.

Most importantly, defendants need not distinguish between different types of adult uses, or a new type of adult use, so long

as the evidence relied upon by the municipality is reasonably believed to be relevant to the problems addressed by the ordinance (*see ILQ Invs., Inc. v City of Rochester*, 25 F3d 1413, 1418 [1994], *cert denied* 513 US 1017 [1994] ["The City reasonably believed that evidence was relevant to the problems addressed by (the Ordinance). *Even if (plaintiff) is a new type of adult business, it may not avoid time, place, and manner regulation that has been justified by studies of the secondary effects of reasonably similar business*" (emphasis added)]; *Stringfellow's,* 91 NY2d at 401, quoting *City of Rochester v Gutberlett*, 211 NY at 316 [" 'Nothing in the studies or in the public testimony justifies distinctive treatment of any adult use.' To the extent that certain individual establishments may legitimately claim that their facilities do not contribute to urban blight, their argument does not impair the constitutionality of the challenged legislation, since '(t)he validity of a statute . . . is not to be determined from its effect in a particular case, but upon its general purpose and its effect to that end' "]).

Plaintiffs place a good deal of emphasis on the United States Supreme Court decision in *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]) and argue that the holding therein narrows the standard formerly enunciated by the United States Supreme Court in *Renton,* which provided the framework for our Court of Appeals' decision in *Stringfellow's,* and that as a result of this new burden-shifting analysis, the motion court's decisions must be upheld. While the holding in *Alameda* does, in fact, represent a more rigorous test for the enacting municipality, we find that, when applied to the matter at bar, it does not require us to invalidate the amendments.

In 1977, the City of Los Angeles conducted a comprehensive study of adult entertainment establishments and concluded that concentrations ("clustering") of adult businesses were associated with higher rates of crime in surrounding communities. As a result, the City enacted an ordinance prohibiting such enterprises within 1,000 feet of each other, or within 500 feet of a religious institution, school or public park (Los Angeles Municipal Code § 12.70 [C]). The ordinance's method of calculating distances, however, created a loophole permitting the concentration of multiple adult enterprises in a single structure. In 1983, the City, relying on its original study of adult establishments, amended the ordinance to prohibit "more than one adult entertainment business in the same building," and two adult establishments that operated combined bookstores/video arcades

sued, alleging the ordinance, on its face, violated the First Amendment. The District Court agreed and found that the ordinance was not a content-neutral regulation of speech; the Ninth Circuit Court of Appeals affirmed (*Alameda Books, Inc. v City of Los Angeles*, 222 F3d 719 [2000]), albeit on a different ground: that even if the ordinance were content-neutral, the City failed to present evidence upon which it could have reasonably relied in enacting the amendment.

The Supreme Court reversed and upheld the ordinance at summary judgment in four separate opinions: a plurality opinion by Justice O'Connor, in which the Chief Justice, Justice Scalia and Justice Thomas joined; a brief concurrence by Justice Scalia; a concurrence in the judgment by Justice Kennedy; and a dissent by Justice Souter, in which Justices Stevens and Ginsburg joined, and in which Justice Breyer joined in part. As a result of this divided ruling, Justice Kennedy's opinion controls under *Marks v United States* (430 US 188, 193 [1977]), since it is the narrowest opinion joining the plurality's judgment (*see Gammoh v City of La Habra*, 395 F3d 1114, 1123 [2005]; *World Wide Video of Wash., Inc. v City of Spokane*, 368 F3d at 1193).

The plurality, in adhering to *Renton*, found that:

> "This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance" (535 US at 438-439).[6]

---

6. Justice Scalia, in a one paragraph concurrence expressed another view, and noted that:

> "I join the plurality opinion because I think it represents a correct application of our jurisprudence concerning regulation of the 'secondary effects' of pornographic speech. As I have said elsewhere, however, in a case such as this our First Amendment traditions make 'secondary effects' analysis quite unnecessary. The Constitution does not prevent those communities that wish

The plurality also emphasized that a municipality is in a better position than the judiciary to gather and evaluate data on its local problems. Justice Kennedy did not disagree with the plurality on either of these points (*see id.* at 451-452 ["The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion" (citations omitted)]).

Indeed, the limitations placed on the plurality opinion are subtle, and concern "the importance of determining and evaluating a city's 'rationale' behind a particular ordinance. . . . Justice Kennedy thus concurred with the . . . plurality with the following cautionary caveat: 'It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary·effects indirectly by attacking speech' " (*World Wide Video of Wash.*, 368 F3d at 1193-1194; *see also* Gerard, Banning, *Two Adult Uses in Same Building Upheld by Fragmented Supreme Court*, 25 Zoning & Plan L Reg 57 [Sept. 2002] ["Of major significance is the fact that under Supreme Court doctrine, the controlling opinion is Justice Kennedy's inscrutable concurrence. Read reasonably, as requiring only that cities advance arguments that speech will not be suppressed, and that courts consider them, without requiring the production of any more or different kinds of evidence than have been required in the past, it requires present practices to change very little"]).

In this matter, we find, contrary to plaintiffs' urgings, that the City Council's enactment of the amendments does not run afoul of *Alameda* as its evidence supports its rationale for the amendments, the character of the 60/40 establishments remains unchanged, and plaintiffs have failed to furnish evidence that casts doubt on the municipality's rationale or factual findings, which would shift the evidentiary burden back to the municipality.

Finally, we perceive no merit in plaintiffs' remaining claims. Plaintiffs contend that the one-year amortization period constituted a taking, yet none of the affected businesses availed themselves of the opportunity to apply to the Board of Standards and Appeals for an extension of the amortization period. Moreover, all of the businesses have had the benefit of remaining in operation pending this appeal.

---

to do so from regulating, or indeed entirely suppressing, the business of pandering sex" (*id.* at 443-444).

We reject plaintiffs' claims that the amendments are unconstitutionally vague as their provisions are sufficiently specific to provide the public with clear and reasonable notice of the type of businesses that are covered (*see Stringfellow's*, 91 NY2d at 405; *see also ILQ Invs*, 25 F3d at 1419). Although the motion court failed to address the issue of the availability of reasonable alternative avenues of communication, sufficient area is available so that the amendments do not have the effect of suppressing, or greatly restricting access to, lawful speech (*see Renton*, 475 US at 54; *Stringfellow's*, 91 NY2d at 402-403).

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered October 14, 2003, and the judgment of the same court and Justice, entered October 23, 2003, which, inter alia, denied defendants' cross motions for summary judgment, granted plaintiffs' motions for summary judgment, declared the challenged 2001 Adult Use Amendments unconstitutional, and permanently enjoined their enforcement, should be reversed, on the law, without costs, plaintiffs' motions denied, defendants' cross motions granted, the injunction vacated, the Adult Use Amendments declared constitutional, and the complaints otherwise dismissed.

ANDRIAS, J.P., FRIEDMAN and ELLERIN, JJ., concur.

Judgments, Supreme Court, New York County, entered October 14, 2003 and October 23, 2003, reversed, on the law, without costs, plaintiffs' motion for summary judgment denied, defendant's cross motions for summary judgment granted, the injunction vacated, the Adult Use Amendments declared constitutional, and the complaints otherwise dismissed.