OPINION OF THE COURT
Louis B. York, J.
This action was tried by the court without a jury on remand from the Court of Appeals. The issue to be decided was the constitutionality of the City of New York’s 2001 amendments to the City defendant’s zoning regulations pursuant to guidelines laid down by the Court of Appeals.
Background
Before a discussion on the merits of the amendments can take place, an understanding of how we got to this point is necessary.
Prior to November 23, 1994, the City of New York made no distinction between adult entertainment and commercial businesses without adult character. The New York City Zoning Resolution of December 15, 1961 allowed adult entertainment businesses to coexist with other commercial or residential land uses. In 1977, the City Planning Commission (CPC) concluded that adult entertainment uses had negative effects on the five boroughs of New York City. The CPC proposed new zoning regulations to distinguish adult entertainment uses and restrict their potential locations. However, the Board of Estimate rejected the proposal because of disagreement about the appropriate extent of such regulations and concern that the regulations would cause the adult businesses to move to new locations. Residents appealed to local officials to shut down adult establishments in their neighborhoods. In response, officials closed adult video stores and bars in Astoria, Jackson Heights, Chelsea, Murray Hill, Forest Hills and Bay Ridge. The number of adult establishments decreased from 151 in 1976 to 131 in 1984. However, the number of adult establishments increased by 35% in 1993. More than 75% of these businesses were in residential areas.
The City, concerned about the potential proliferation of adult uses, conducted a study of the negative secondary effects of adult establishments in New York City. The Department of City Planning (DCP) study included (1) a survey of existing studies concerning the impacts of adult entertainment establishments *1081 and of regulation of such establishments in other localities;* (2) a description of the adult entertainment businesses in New York City; (3) a review of studies and reports of adult entertainment establishments in New York City; (4) a DCP survey of the impacts these establishments have on communities in the City; and (5) a set of overall findings and recommendations. The 1994 DCP report’s overall findings included: there had been a growth in the amount of adult entertainment establishments between 1984 and 1993; adult entertainment businesses tend to concentrate in one area; real estate brokers perceived that adult entertainment establishments negatively affected nearby property values and decreased market values; and adult establishments generally used large, illuminated, and sexually graphic signs, a fact which concerned community residents about the exposure of minors to sexual images. As a result, the 1994 DCP report purported to link adult businesses to various adverse secondary effects, including nearby crime and lower property values.
Based on the 1994 DCP report, the City decided to regulate adult entertainment establishments differently from other commercial establishments by restricting the location of adult uses in residential areas, and near houses of worship, schools and each other. Accordingly, following the issuance of the 1994 DCP report, the New York City Council adopted application N950113 for an amendment to the Zoning Resolution, which became an amendment on November 23, 1994. The 1995 amendment to Zoning Resolution former § 11-113 (the 1995 Resolution) banned the extension or enlargement of existing adult businesses and prohibited the change of any use to an adult enterprise in all of New York City. The 1995 Resolution redefined “adult establishment”: “An adult establishment is a commercial establishment where a ‘substantial portion’ of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof’ (N950384 ZRY Resolution No. 1322 [L.U. No. 713], amending NY City Zoning Resolution former § 12-10). The text amendment pointed to the following factors to determine whether a “substantial portion” of the facility was “adult”:
“(1) the amount of floor area and cellar space acces *1082 sible to customers and allocated to [adult] uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to [adult] uses as compared to the total floor area and cellar space accessible to customers in the establishment.” (NY City Zoning Resolution former § 12-10.)
The 1995 Resolution also barred exclusively adult businesses from all residential zones and most commercial and manufacturing districts. (NY City Zoning Resolution former § 32-01 [a]; § 42-01 [b].) In areas where adult establishments were permitted, the businesses had to be at least 500 feet from schools, churches, other adult establishments, and certain commercial and manufacturing districts. (NY City Zoning Resolution former § 32-01 [b]; § 42-01 [b].) There was a one-year moratorium for existing adult establishments. Within this period the businesses had to conform to the 1995 Resolution or terminate their business. (NY City Zoning Resolution §§ 52-77, 52-734.)
In response to the 1995 Resolution, more than 100 owners and operators of adult establishments joined together to take action against the City. The first action sought a declaratory judgment holding the 1995 Resolution unconstitutional. (Amsterdam, Video, Inc. v City of New York, Sup Ct, NY County, index No. 103568/96.) In the second, the New York Civil Liberties Union filed Hickerson v City of New York (Sup Ct, NY County, index No. 103569/96) on behalf of consumers of adult expression. On July 22,1996, counsel for adult-oriented cabarets commenced a third case challenging the 1995 Resolution. (Stringfellow’s of N.Y. Ltd. v City of New York, Sup Ct, NY County, index No. 113049/96.)
Of particular relevance here, plaintiff in Amsterdam Video, Inc. sought to enjoin the law’s enforcement by claiming that the operative phrase “substantial portion” was fatally vague. {Amsterdam Video, Inc., SD NY, docket No. 96 Civ 2204 [MGC].) However, the City Planning Commission’s report made it clear that any commercial establishment with “at least 40 percent of its accessible floor area used for adult purposes qualifies as an ‘adult establishment’ or ‘adult bookstore.’ ” (CPC report, Sept. 18, 1995, at 50.) This equation became known as the “60/40 allocation.” Operations Policy and Procedure Notice (OPPN) No. 4/98 confirmed the 60/40 equation:
“If at least 40 percent of the book store’s total stock accessible or available . . . for sale or rent to customers is comprised of adult materials, then the book store has a ‘substantial portion’ of its stock in *1083 adult materials, and is therefore an ‘adult book store.’
“An establishment also includes an adult book store if 40 percent of the establishment’s floor area and cellar space accessible to customers contains stock in adult materials.” (Department of Buildings, Operations Policy and Procedure Notice No. 4/98, July 22, 1998.)
The actions were not formally consolidated, but a single decision upheld the regulations under the New York Constitution. (Stringfellow’s of N.Y. v City of New York, 171 Misc 2d 376 [Sup Ct, NY County 1996], affd 241 AD2d 360 [1st Dept 1997], affd 91 NY2d 382 [1998].) The Court found that the 1995 Resolution was not vague, it was a sufficiently narrow solution to deal with the secondary effects, and the 1994 DCP report served as a proper basis for the 1995 Resolution. (Id. at 397, 399-400.) In federal court, the court found that the businesses were collaterally estopped from pursuing their First Amendment claims. (Hickerson v City of New York, 997 F Supp 418 [SD NY 1998], affd 146 F3d 99 [2d Cir 1998], cert denied 525 US 1067 [1999].)
The 1995 Resolution effectively reduced the number of adult establishments from 177 in 1993 to 136 in 2000. (CPC report, Aug. 8, 2001, at 6.) The 60/40 equation has been the governing standard since July 1998. Adult businesses altered themselves to ensure they were not “adult establishments” within the meaning of the Zoning Resolution. They reconfigured their accessible floor area so that less than 40% contained adult material. Adult bookstores purchased nonadult stock, such as non-adult videos, and adult theaters showed both adult and nonadult films. Nonetheless, the City brought claims against these businesses under the Nuisance Abatement Law (Administrative Code of City of NY § 7-701 et seq.). In these nuisance abatement cases, the City consistently asserted that the adult establishments were in sham compliance with the 1995 Resolution. The City argued that based on the sale-to-rental ratio of the adult videos and the lack of need to replenish nonadult videos, it was clear that despite facial 60/40 compliance, a store actually did more than 60% of its business in adult videos. (City of New York v Warehouse on Block, 183 Misc 2d 489, 490 [Sup Ct, Queens County 2000].) The Court of Appeals said the definition of “stock” does not allow an inquiry into whether inventory is moving. “Instead, the focus is solely on the appropriate percentages of stock and floor and cellar space . . . [T]he City’s *1084 guidelines provide no support for the view that profitability or stability of the nonadult stock need be considered.” (City of New York v Les Hommes, 94 NY2d 267, 273 [1999]; see also Warehouse on Block, 183 Misc 2d at 491-492 [only relevant factors are stock and floor area].)
In response to a report of the CPC and after public hearings in October 2001, the amendments were adopted by the City Council. These amendments removed “substantial portion” from the definition of an adult establishment. Now, “[a]n ‘adult establishment’ is a commercial establishment which is or includes an adult book store, adult eating or drinking establishment ... or any combination thereof.” (NY City Zoning Resolution § 12-10.) However, “substantial portion” was not removed for adult video and bookstores, but nonadult material was not to be considered stock in video and bookstores for substantial portion analysis if: (1) customers had to pass through adult material to reach the nonadult section; (2) any material exposed one to adult material; (3) nonadult material was only for sale, while adult material was for sale or rent; (4) more adult printed materials were available than nonadult ones; (5) minors were restricted from the entire store or from any section offering nonadult material; (6) signs or window displays of adult matter were disproportionate to signs and window displays featuring nonadult matter; (7) booths were available for viewing adult movies or live performances; and (8) purchasing nonadult material exposed the buyer to adult material.
The plaintiffs then brought this action on behalf of adult book stores and theaters while a companion case, Ten’s Cabaret v City of New York (1 Misc 3d 399 [Sup Ct, NY County 2003]), on behalf of adult eating and drinking establishments was also brought.
The defendants urged that the mechanical reliance on the 60/40 formula allowed sham compliance with the statute.
The Injunction
Just prior to the effective date of the amendments, plaintiffs brought this action attacking their constitutionality and asking for a preliminary injunction. Defendants contended that the statute was a rational exercise of the City’s attempt to eradicate sham compliance. This court granted the injunction, adopting, in essence, plaintiffs’ approach, that the 60/40 entities had expended much time, effort and treasure in converting themselves into brand new entities which no longer resembled the 100% entities that the 1995 amendments were aimed at. Based *1085 on studies of the negative effects on property values, crime and children who viewed the adult content in store windows and outside signage, those amendments had been upheld. The 2001 amendments, because they were not based on studies related to the changed 60/40 establishments, did not establish any basis for regulation of this constitutionally protected form of speech. Therefore, there was a strong likelihood of success on the merits. Accordingly, the preliminary injunction was granted (For the People Theatres of N.Y. v City of New York, 1 Misc 3d 394 [Sup Ct, NY County 2003]).
The Appeals
The Appellate Division reversed (20 AD3d 1 [2005]) and the Court of Appeals modified the reversal (6 NY3d 63 [2005]). The Court of Appeals remanded for trial. It stated that the trial court need not conduct another study. Its task was to determine, in accordance with the 2001 amendments, whether the self-identified 60/40 entities were so changed in their essential character that their predominant ongoing focus was no longer on sexually explicit material. If that is not the case, then their reliance on the 60/40 formula is a sham, and the same studies on the negative secondary effects will apply (For the People Theatres of N.Y., Inc. v City of New York, 6 NY3d 63 [2005]). The burden, said the Court, is a light one, and is on the City to demonstrate by substantial evidence that the predominant ongoing focus of the establishments is on sexually explicit materials. If it does so, then the studies showing the adverse effects of these adult institutions apply and the amendments are constitutional (id.).
The Trial
Thus, this court embarks upon the task of determining whether during the trial the City substantially showed that the conversion to 60/40 status is a sham because the ongoing predominant focus on these self-identified 60/40 entities is on sexually explicit materials.
The plaintiffs’ direct case showed that the Fair Theatre has removed all references to “adult” or “xxx” from its marquee. George Androtsakis, its owner, testified that it spends about $100,000 a year for nonadult films and only about $10,000 per year for adult films. The marquee read “First Run in Queens” and “Two Top Hits.” It advertises nonadult films in the New York Times, Village Voice, New York Post and the Daily News. It shows four Bollywood films per week in the main auditorium. When he visited, City Inspector lulo observed more people in *1086 the nonadult section than in the adult section. The theatre also has 30 peep booths. At the time it was inspected, there were eight customers in the adult theatre and 10 customers in the smaller nonadult rooms.
Thomas Simmons, the property manager of Show World, testified that all live adult entertainment and “xxx” movies have been removed. It advertises nonadult entertainment in the New York Times,' Village Voice, New York Post, Daily News, and Time Out. The marquee advertises its comedy club. It has eliminated booths with glass partitions through which a customer could view live performers. Its peep booths were removed. The lounges and stages were converted from live performances to nonadult film auditoriums. It has replaced its theatre with a comedy club. Minors are excluded from the entire premises. Adult movies and magazines have been removed from the premises. It has 60 peep booths in the basement. The nonadult comedy club and an adult book store operate side by side.
The Kings Cinema in Brooklyn has no outdoor signage. Inspector lulo stated that during the investigator’s visit that there were more customers in the nonadult sections than in the adult sections.
In the Blue Door Video and Video Excitement stores, the number of patrons in the nonadult sections outnumbered the number of patrons in the viewing area.
None of the 60/40 entities were located on the Police Department’s “hot spots” for crime.
■ The defendant City of New York inspected 15 self-identified 60/40 businesses. It claims that 13 of them participated in sham compliance. There follows a description of a shortened number of those establishments which is sufficient for the purposes of this decision.
Officer Dowd testified that the goods offered in the adult sections of the establishments he examined were very similar to the merchandise offered for sale when he performed inspections in 1998.
Thunder Lingerie had a neon sign above the front entrance advertising peep shows. It had signs on the front door advertising private viewing booths. The window display contained adult novelties. The sign in the entry foyer stated a person had to be 18 or older to enter. Dowd testified that in the nonadult sections, patrons were able to view items in the adult sections. There were also signs there stating that there were peep booths available.
*1087 Show World had outside signs touting adult movies and private viewing booths. Inside were many signs announcing adult movies and adult viewing booths. Minors are excluded from the premises. In the basement, adult movies and 22 adult viewing booths were available. Though nonadult movies and magazines were sold in the basement, this section is only accessible by walking through the adult section. The nonadult comedy club and the adult bookstore operate side by side. The comedy club is open only when it has engagements while the rest of Show World is open 24/7.
Amsterdam Video was the only self-described 60/40 establishment identified as a sham complier by the City that had no peep booths. Its window display contains lingerie and adult novelties. The nonadult sections contained dildos and adult novelties. Adult videos were on wall racks while the nonadult ones viewed were strewn on the floor.
At 87 Blue Door Video, while walking into the store, even before reaching the cashier, one is exposed to adult lingerie, sex toys, dildos, etc. There are 12 peep booths on the first floor and 12 peep booths in the basement.
The Love Shack has eight peep booths which are advertised on the outside of the store. A sign on the front door states that patrons must be 21 to enter. In the nonadult section, there are adult novelties, lotions, condoms, oils and a view of the adult section.
At the Blue Door Video and Video Excitement, in addition to what plaintiffs’ proof has shown, there are rubber goods, lotions, negligees, leather clothing and harnesses for sale in the nonadult portions of the stores.
In the Fair Theatre, there were 27 peep booths.
At Kings Cinema, age restrictions were observed in the adult portions.
At Mixed Emotions, the adult and nonadult sections were separated by a line of black tape across the floor. A neon sign advertised adult toys and novelties and private outdoor viewing booths. On the entry door lotions, lubricants and marital toys are advertised. Customers had to be 18 to enter. In the nonadult section, rubber goods and novelties, including dildos, are for sale. These items are alleged to take up one third of the 60% portion of the store. In the nonadult section are also sold lingerie, lotions, oils and condoms. There are 12 peep booths.
*1088 Motion to Dismiss
When defendant rested, the plaintiffs moved to dismiss, contending that the City had failed to make out a prima facie case because it failed to submit any evidence that any of the institutions that the City put forth as 60/40 entities were, in fact, 60/40 entities. Although the Court of Appeals stated that the City had a “light burden” there were no measurements of the physical layouts or any other evidence to show that those establishments were in fact 60/40 bookstores or theaters. I reserved decision. In their subsequent written memorandums, the plaintiffs reiterated their motion. I now deny the plaintiffs’ motion. The instruction to the parties from the Court of Appeals was directed to self-identified establishments. That is what all the businesses examined by the City were; otherwise, they would not have located themselves in the areas they were in as permitted by the unamended 1995 zoning law.
Contentions
Both sides seek judgment in their favor. Plaintiffs insist that the essential nature of these 60/40 establishments has changed, arguing that where more than 60% of inventory is on nonadult materials, their predominant focus is nonadult. This is further illustrated by the smaller amount of adult materials being in the back of the store and the removal of “adult” or “xxx” signs from outdoor signs. Moreover, the City has failed to satisfy its burden: first, by not doing the proper measurements to determine whether the entities inspected by the City were actually 60/40 establishments, and second, by not making a comparison of the present 60/40 entities with those involved in the 1994 study that generated the 1995 amendments, and by failing to show that these businesses generated adverse secondary effects.
The defendant City of New York counters, contending that it has proved that the pertinent book and video stores are sham nonadult establishments given their emphasis on adult films, peep shows and sexual novelties and toys. The City also points out that in the movie theaters, by the payment of one price, customers can stay as long as they like and see as many movies as they like. The Fair Theatre’s focus on adult material is shown by the over two dozen peep booths available for customers. Decision
The court notes that this decision is not being made against a blank slate. After much litigation and by direction of the Court of Appeals, a trial was directed and held. Keeping in mind that *1089 the City’s burden was a “light” one, it had only to establish that the conversion of 100% adult entities to 60/40 status was a sham because their continuing ongoing focus is on adult material. Thus, their essential nature as adult establishments has not changed and no new study had to be undertaken to determine whether 60/40 entities had a deleterious effect on their surrounding environs (For the People Theatres of N.Y., Inc. v City of New York, 6 NY3d 63 [2005]).
Moreover, the City was directed that substantial evidence was all that was necessary to satisfy its burden. This burden is consistent with prior high-court determinations in adjudicating the standard by which the constitutionality of statutes and regulations regulating speech has been decided (Turner Broadcasting System, Inc. v FCC, 512 US 622 [1994]; People v Mobil Oil Corp., 48 NY2d 192 [1979]). While the content of speech cannot be regulated, the time, place and manner can be as a legitimate exercise of the state’s police power. (Id.)
While the plaintiffs may have introduced evidence that the essential nature of these entities has changed, it is also true that the defendants have provided substantial evidence that their dominant, ongoing focus is on adult matters. Therefore, the defendants have satisfied their “light” burden with regard to bookstores and video stores. (See Matter of Zacher v Michael, 64 NY2d 686 [1984] [where there was substantial evidence that petitioners’ testator was not an employee, and ample evidence that he was an employee, the substantial evidence of nonemployment prevailed].)
However, I am not convinced that the same holding applies to the two adult movie theaters in this action. The admittedly large number of peep shows in one theatre and the payment of one admission in both theatres which allows a patron to see all of the movies, both adult and nonadult, do not rise even to the low level of substantial evidence.

 The cities studied in the 1994 report include Boston, Phoenix, Detroit, Seattle, Atlanta, Kansas City, Los Angeles, San Diego and the Long Island communities of Islip, Brookhaven, Smithtown, Babylon, and Huntington.