[843 NE2d 1121, 810 NYS2d 381]

FOR THE PEOPLE THEATRES OF N.Y., INC., Doing Business as FAIR THEATRE, et al., Appellants, v CITY OF NEW YORK et al., Respondents.

TEN'S CABARET, INC., Formerly Known as STRINGFELLOW'S OF NEW YORK, LTD., et al., Appellants, v CITY OF NEW YORK et al., Respondents.

Argued November 17, 2005; decided December 15, 2005

64

**POINTS OF COUNSEL**

*Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP,* New York City (*Herald Price Fahringer* and *Erica T. Dubno* of counsel), for For the People Theatres of N.Y., Inc., and another, appellants. I. The New York Supreme Court properly found that the amendments to the Zoning Resolution of the City of New York are unconstitutional and the City of New York failed to meet its burdens to sustain this unnecessary, unprecedented and unwarranted change in the zoning law. (*Matter of Town of Islip v Caviglia,* 73 NY2d 544; *Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96; *Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Akpan v Koch,* 75 NY2d 561; *Albright v Town of Manlius,* 28 NY2d 108; *Town of Huntington v Pierce Arrow Realty Corp.,* 216 AD2d 287; *Cellular Tel. Co. v Village of Tarrytown,* 209 AD2d 57; *Salamar Bldrs. Corp. v Tuttle,* 29 NY2d 221; *Asian Ams. for Equality v Koch,* 72 NY2d 121; *Mc-Minn v Town of Oyster Bay,* 66 NY2d 544.) II. The 2001 Zoning Resolution of the City of New York, which was enacted in violation of established zoning principles and is being used to micromanage the operation of bookstores, constitutes an abuse of the City of New York's zoning power. (*Smith v California,* 361 US 147; *Town of Huntington v Sudano,* 42 AD2d 791, 35 NY2d 796; *Matter of Schlosser v Michaelis,* 18 AD2d 940; *Matter of West-*

*bury Trombo v Board of Trustees of Vil. of Westbury,* 307 AD2d 1043; *Matter of St. Onge v Donovan,* 71 NY2d 507; *North St. Book Shoppe, Inc. v Village of Endicott,* 582 F Supp 1428; *Schad v Mount Ephraim,* 452 US 61; *Bernstein v Board of Appeals of Vil. of Matinecock,* 60 Misc 2d 470; *Betty-June School v Young,* 25 Misc 2d 909; *Udell v Haas,* 21 NY2d 463.) III. There is no basis for eliminating private viewing booths, which allow patrons to view a greater variety of constitutionally protected films. (*City of New York v S&H Book Shop,* 41 AD2d 637; *Time Sq. Books v City of Rochester,* 223 AD2d 270; *Barbulean v City of Newburgh,* 168 Misc 2d 728; *People v Mitchell,* 74 Misc 2d 1053.) IV. The definition of "adult establishment" is impermissibly vague. (*People v Foley,* 94 NY2d 668; *Pringle v Wolfe,* 88 NY2d 426, 519 US 1009; *People v Stuart,* 100 NY2d 412.) V. The 2001 Zoning Resolution of the City of New York improperly endows the Commissioner of Buildings with unbridled authority to adopt rules relating to a bookstore's "method of operation." (*People v Mitchell,* 74 Misc 2d 1053.) VI. The new restrictions on packaging for marital aids are wholly unsupported by the record. VII. The 2001 Zoning Resolution of the City of New York impermissibly restricts the public's access to free expression by reducing the number of outlets for any adult entertainment. (*Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *City of New York v Black Garter,* 273 AD2d 188.) VIII. The Supreme Court properly granted summary judgment to the constitutionally protected businesses. (*JMD Holding Corp. v Congress Fin. Corp.,* 4 NY3d 373; *Falk v Goodman,* 7 NY2d 87; *Millerton Agway Coop. v Briarcliff Farms,* 17 NY2d 57; *Grecco v Corbis Sygma,* 281 AD2d 239; *Aufrichtig v Lowell,* 85 NY2d 540; *General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.,* 85 NY2d 232; *City of New York v Les Hommes,* 94 NY2d 267.) IX. Appellants join in the arguments of appellants in the related appeal.

*Alonso, Andalkar & Kahn, P.C.,* New York City (*Mark J. Alonso, Jaymee Kahn* and *Pritina Bhavsar* of counsel), for Ten's Cabaret, Ltd., appellant. I. The Appellate Division's decision runs afoul of the United States Supreme Court decision in *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]). (*Chiasson v New York City Dept. of Consumer Affairs,* 138 Misc 2d 394; *Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Asian Ams. for Equality v Koch,* 72 NY2d 121; *Salamar Bldrs. Corp. v Tuttle,* 29 NY2d 221; *Albright v Town of Manlius,* 28 NY2d 108; *Flanigan's Enters., Inc. of Ga. v Fulton County,* 242 F3d 976, 536 US 904; *Hickerson v City of New York,* 146 F3d 99, 525 US

1067; *Peek-A-Boo Lounge of Bradenton, Inc. v Manatee County,* 337 F3d 1251; *Renton v Playtime Theatres, Inc.,* 475 US 41.) II. The Appellate Division incorrectly determined that the 2002 adult use amendments are constitutional. (*Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Schad v Mount Ephraim,* 452 US 61; *Young v American Mini Theatres, Inc.,* 427 US 50; *Moore v East Cleveland,* 431 US 494; *Matter of Consolidated Edison Co. of N.Y. v Public Serv. Commn. of State of N.Y.,* 47 NY2d 94; *Brandenburg v Ohio,* 395 US 444, 447 US 530; *Central Hudson Gas & Elec. Corp. v Public Serv. Comm'n of N. Y.,* 447 US 557; *Suffolk Hous. Servs. v Town of Brookhaven,* 70 NY2d 122; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553.) III. The trial court correctly granted summary judgment to Ten's Cabaret, Ltd. (*Aufrichtig v Lowell,* 85 NY2d 540; *General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.,* 85 NY2d 232; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Cox v Kingsboro Med. Group,* 88 NY2d 904; *Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851; *GTF Mktg. v Colonial Aluminum Sales,* 66 NY2d 965; *Zuckerman v City of New York,* 49 NY2d 557; *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *Guariglia v Blima Homes,* 89 NY2d 851.)

*Mehler & Buscemi,* New York City (*Martin P. Mehler* of counsel), for Pussycat Lounge, Inc. and others, appellants. I. The claim that the 2001 amendments were merely a clarification of the City of New York's original legislative intent is demonstrably a sham. (*Matter of Town of Islip v Caviglia,* 73 NY2d 544; *Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *Bellanca v New York State Liq. Auth.,* 54 NY2d 228, 456 US 1006; *Schad v Mount Ephraim,* 452 US 61; *City of New York v Show World,* 178 Misc 2d 812, *affd sub nom. City of New York v Les Hommes,* 258 AD2d 284, 94 NY2d 267; *City of New York v Dezer Props.,* 95 NY2d 771; *Los Angeles v Alameda Books, Inc.,* 535 US 425.) II. The 2001 amendments violate article I, § 8 of the New York State Constitution. (*Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Immuno AG. v Moor-Jankowski,* 77 NY2d 235; *People v P. J. Video,* 68 NY2d 296, 479 US 1001; *Matter of Town of Islip v Caviglia,* 73 NY2d 544; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *Miller v California,* 413 US 15; *Renton v Playtime Theatres, Inc.,* 475 US 41; *DiMa Corp. v Town of Hallie,* 185 F3d 823; *Colacurcio v City of Kent,* 163 F3d 545; *J & B Entertainment, Inc. v City of Jackson,* 152 F3d 362.) III. In the unlikely event that summary judgment in favor of plaintiffs is

not reinstated on this appeal, the cases should be remanded to the trial court. (*Los Angeles v Alameda Books, Inc.,* 535 US 425; *Council of Regulated Adult Liq. Licensees v City of N.Y. Police Dept.,* 300 AD2d 17; *Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Zuckerman v City of New York,* 49 NY2d 557.)

Michael A. Cardozo, Corporation Counsel, New York City (*Leonard Koerner, Robin Binder* and *Elizabeth S. Natrella* of counsel), for respondents. I. As the Appellate Division held, based on the legislative record and *Stringfellow's of N.Y. v City of New York* (91 NY2d 382 [1998]), the 2001 amendments to the City of New York's 1995 Adult Zoning Ordinance (NY City Zoning Resolution) are facially constitutional. No new study or specific empirical evidence of the well-documented negative secondary effects of adult establishments was required. (*Asian Ams. for Equality v Koch,* 72 NY2d 121; *DJL Rest. Corp. v City of New York,* 96 NY2d 91; *Matter of Town of Islip v Caviglia,* 73 NY2d 544; *Renton v Playtime Theatres, Inc.,* 475 US 41; *Young v American Mini Theatres, Inc.,* 427 US 50; *Los Angeles v Alameda Books, Inc.,* 535 US 425; *Erie v Pap's A.M.,* 529 US 277; *City of Rochester v Gutberlett,* 211 NY 309; *ILQ Invs. v Rochester,* 25 F3d 1413, 513 US 1017; *LLEH, Inc. v Wichita County, Tex.,* 289 F3d 358, 537 US 1045.) II. Plaintiffs' few other challenges to the 2001 amendments are meritless. (*Stringfellow's of N.Y. v City of New York,* 91 NY2d 382; *Matter of Town of Islip v Caviglia,* 141 AD2d 148, 73 NY2d 544; *Young v American Mini Theaters, Inc.,* 427 US 50; *People v Stuart,* 100 NY2d 412; *Broadrick v Oklahoma,* 413 US 601; *New York v Ferber,* 458 US 747; *People v Hollman,* 68 NY2d 202; *City of New York v Les Hommes,* 94 NY2d 267; *City of New York v Warehouse on Block,* 183 Misc 2d 489; *Members of City Council of Los Angeles v Taxpayers for Vincent,* 466 US 789.)

OPINION OF THE COURT

READ, J.

The issue on this appeal is whether New York City's adult use zoning regulations, as amended in 2001, serve a public purpose other than censorship and therefore do not infringe upon plaintiffs' rights of free speech under the federal and state constitutions. We conclude that, on this record, a question of fact exists, requiring further proceedings in Supreme Court.

I.

As was the case when we last reviewed adult use zoning regulations adopted by the City, "[t]he 'adult' establishments at

the center of this controversy offer various forms of sexual expression," and include "bookstores, theaters, stores dealing in videotaped material and places of live entertainment" (*Stringfellow's of N.Y. v City of New York*, 91 NY2d 382, 390 [1998]). This appeal travels to us in the slipstream of an extensive history, which informs the City's rationale for the amended regulations challenged by plaintiffs.

In 1977, the City Planning Commission (CPC) concluded that adult entertainment establishments negatively affected the city's communities. At that time, there was no zoning distinction between adult entertainment businesses and other, non-adult operations. The CPC therefore proposed new zoning regulations to identify and restrict the location of adult entertainment businesses in order to ameliorate their harmful social effects. Ultimately, however, the CPC's proposal foundered on worries about the proposed regulations' scope, and fears that they would only prompt adult businesses to relocate.

Although local officials throughout the five boroughs, acting on their own, closed adult businesses, the number of these establishments had mushroomed by 1993. Many set up shop in residential areas. These circumstances caused the Department of City Planning (DCP) to examine the negative social consequences of adult establishments. The DCP Study focused on three types of businesses offering sexually explicit materials or entertainment: adult or triple-X book and video stores, which often provide "peep" booths for on-premises viewing; topless/nude bars or strip clubs; and adult theaters, which offer movies or live entertainment. The DCP's "Adult Entertainment Study," dated September 1994, included a description of how and where these businesses operated in the city; a review of trends in the growth and development of adult businesses; a survey of adult entertainment studies performed elsewhere and adult use zoning regulations adopted in other communities; a review of previous studies and reports on adult businesses in the city; and DCP's own survey of the impact that isolated adult businesses had on several city communities. Based on these sources, the 1994 DCP Study concluded that other cities had documented numerous "negative secondary impacts" from adult businesses, including "increased crime rates, depreciation of property values, deterioration of community character and quality of urban life"; that adult businesses had proliferated in the city in the previous 10 years; that these businesses tended to cluster; that real estate agents perceived that adult businesses lowered

nearby property values; and that adult businesses generally used large, illuminated, sexually graphic signs, which might expose minors to sexual images. In summary, the 1994 DCP Study linked these adult businesses, particularly in concentration, to adverse secondary effects in the communities in which they were located, and recommended regulating them more closely than other commercial uses.

Subsequently, the DCP applied to the CPC for an amendment to the City's Zoning Resolution to approve regulations governing "adult establishments." In its September 1995 Report approving the DCP's application and the regulations, the CPC observed that "[a]s a general matter, 'adult establishments' are intended to be *only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities*" (emphasis added). The 1995 CPC Report pointed out that the regulations were tailored to cover "this limited range of establishments," and so were designed to exclude legitimate theatrical performances and films including nudity or having a sexual theme (e.g., "Love! Valour! Compassion!," "Oh! Calcutta!" and some Off-Broadway and experimental productions); bookstores that focus on, for example, gay and lesbian themes, but which carry a stock-in-trade covering a wide range of topics (e.g., gay adoptions, biographies by and about prominent gay people, poetry and literature with gay themes, etc.) in addition to gay and lesbian erotica; general interest bookstores, such as Barnes & Noble, with a small portion of stock devoted to erotica; and art galleries displaying sexually explicit artwork.

In October 1995, the City Council adopted these regulations, which featured locational restrictions and anti-concentration provisions designed to shield the city's residential neighborhoods and the facilities and commercial areas that serve them from the negative secondary effects of adult uses. Specifically, the 1995 Ordinance barred adult businesses from residential zones, as well as from many commercial and manufacturing areas; restricted adult businesses' locations in relation to residential areas, schools, day care centers, houses of worship and each other; and limited their maximum size to 10,000 square feet.

The 1995 Ordinance defined "adult establishment" as follows: "An 'adult establishment' is a commercial establishment where a *'substantial portion'* of the establishment includes an

adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (Amended Zoning Resolution § 12-10 [emphasis added]). An "adult book store" was defined as having a "substantial portion" of its "stock-in-trade" in, among other things, printed matter or video representations depicting "specified sexual activities" or "specified anatomical areas," as those terms were also defined in the 1995 Ordinance (*id.*). An "adult eating or drinking establishment" was defined as an eating or drinking establishment "which regularly features" live performances or movies "characterized by an emphasis on" "specified sexual activities" or "specified anatomical areas," or whose employees regularly expose "specified anatomical areas" to patrons as part of their employment, and which excludes minors (*id.*). Similarly, an "adult theater" was defined as a theater "which regularly features" movies or live performances "characterized by an emphasis on" "specified sexual activities" or "specified anatomical areas," and which excludes minors (*id.*).

The 1995 CPC Report discussed the terms "substantial," "which regularly features" and "characterized by an emphasis on" in the context of its efforts to craft regulations that were both broad enough to cover the kinds of establishments studied in the 1994 DCP Study—"book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities"—and narrow enough to exclude "general interest book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment" or "establishments which offer adult entertainment on an occasional basis, such as a monthly live performance or a nightly midnight showing at a movie theater." Similarly, the regulations were targeted at those eating and drinking establishments where "adult entertainment [was] a principal form of entertainment at the establishment," and at those theaters where "adult entertainment [was] the principal purpose of the theater showing the adult material." In other words, it is not the case, as the dissent contends, that the City in 1995 intended only "to regulate businesses that devoted a substantial portion of their operations to adult entertainment" or "set out to regulate only businesses that devoted a 'substantial portion' of their space to adult entertainment" (dissenting op at 85, 86). The City intended to regulate businesses with a "predominant, on-going focus on sexually explicit materials or activities," as it

was the nature or character of these kinds of enterprises, not the amount of floor area or the percentage of inventory devoted to adult uses, that created negative secondary effects. The qualifiers "substantial,"[1] "which regularly features" and "characterized by an emphasis on" were intended to make sure that the 1995 Ordinance did not inadvertently sweep too broadly.

Accordingly, the 1995 Ordinance set forth factors determinative of whether a "substantial portion" of a business was "adult":

> "(1) the amount of floor area and cellar space accessible to customers and allocated to [adult] uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to [adult] uses as compared to the total floor area and cellar space accessible to customers in the establishment." (Amended Zoning Resolution § 12-10 [Adult Establishment].)

The 1995 Ordinance further specified that, for purposes of determining whether an adult bookstore's "stock-in-trade" reached the "substantial portion" threshold, the following factors were to be considered:

> "(1) the amount of [adult] stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of floor area and cellar space accessible to customers containing such stock; and (3) the amount of floor area and cellar space accessible to customers containing such stock as compared to the total floor area and cellar space accessible to customers in the establishment." (*Id.*)

Subsequently, the City's Department of Buildings, which is responsible for interpreting and enforcing the City's Zoning Resolution, issued guidelines to clarify what constituted a "substantial portion" within the meaning of the 1995 Ordinance. In general, these guidelines provided that a business was an adult establishment if "at least 40 percent of the floor and cellar area . . . accessible to customers" was available for adult

---

1. In its 1995 Report, the CPC expressed its belief that "[a]s a general guideline . . . an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the [1994] DCP Study," but noted that "there may be exceptions to this general guideline."

use (*see* Operations Policy and Procedure Notice [OPPN] Nos. 4/98, 6/98). With respect to bookstores, the guidelines also applied the 40% threshold to the store's total stock accessible or available for sale or rent (*id.*).

A number of adult businesses sued the City in state and federal court, principally challenging the 1995 Ordinance as improperly infringing upon their rights of free speech protected by the First Amendment of the Federal Constitution and article I, § 8 of the State Constitution. In *Stringfellow's*, we determined that the 1995 Ordinance was "not an impermissible attempt to regulate the content of expression but rather was aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose" (*Stringfellow's*, 91 NY2d at 399), citing our earlier decision in *Matter of Town of Islip v Caviglia* (73 NY2d 544 [1989]). Further, the 1995 Ordinance "represent[ed] a coherent regulatory scheme designed to attack the problems associated with adult establishments" (91 NY2d at 400). By "protect[ing] only those communities and community institutions that are most vulnerable to . . . adverse impacts," the 1995 Ordinance was no broader than necessary (*id.*). In addition, there were reasonable alternative avenues of communication, insofar as the 1995 Ordinance "allow[ed] adult businesses to remain in districts that permit a wide mix of commercial, retail, entertainment and manufacturing uses" and, in virtually every instance, were "within a 10-minute walk from a subway line or a major bus route" (*id.* at 403). We concluded that, based on the legislative record, the 1995 Ordinance complied with the standards set forth by the United States Supreme Court in *Renton v Playtime Theatres, Inc.* (475 US 41 [1986]), and by us in *Town of Islip*, and did not violate the plaintiffs' rights of free speech.

The 1995 Ordinance also surmounted facial First Amendment challenges in federal court. Under the authority of *Young v American Mini Theatres, Inc.* (427 US 50 [1976]) and *Renton*, which derives from *Young*, the United States Court of Appeals for the Second Circuit held in *Buzzetti v City of New York* (140 F3d 134, 141 [1998], *cert denied* 525 US 816 [1998]) that the 1995 Ordinance was a "content-neutral time, place, and manner regulation, [was] justified by substantial government interests and allow[ed] for reasonable alternative avenues of communication, and, accordingly, [did] not violate the First Amendment" (*see also Hickerson v City of New York*, 146 F3d 99 [1998], *cert denied* 525 US 1067 [1999]).

The 1995 Ordinance took effect in July 1998 after a series of judicial stays of enforcement lapsed. Numerous adult businesses reconfigured their floor areas and stock, seeking to fit within the 60/40 construct for defining "substantial portion." The City contended, however, that these so-called 60/40 businesses were merely engaged in ploys to evade enforcement and did not, in fact, comply with the 1995 Ordinance.

In *City of New York v Les Hommes* (94 NY2d 267 [1999]), the City sought to shut down a store where only 24% of the stock consisted of adult videos, but the nonadult videos were offered only for sale, not for rent, did not turn over, had been supplemented very modestly and were located in a back room. The lower courts agreed with the City that the store's compliance with the 1995 Ordinance was a sham; that is, despite its technical compliance with the 60/40 formula, the store's business still centered on purveying sexually explicit materials. Based on the 1995 Ordinance's "plain language" and the "precise guidelines" that the City had developed to enforce it, however, we reversed (*id.* at 273). In so doing, we observed that

> "[i]n the end, we must enforce the City's administrative guidelines as written. Either the stock is accessible or available, or it is not; either the appropriate amount of square footage is dedicated to nonadult uses, or it is not. Questions about whether the owner of [the store] had a good-faith desire to sell nonadult products, whether the 'essential nature' of [the store] is adult or nonadult, or whether the volume of nonadult stock is stable or profitable are not part of the inquiry here, where we are only called upon to determine whether items are accessible or available as stock. We cannot rewrite the City's guidelines to include these additional considerations" (*id.*; *see also City of New York v Dezer Props.*, 95 NY2d 771 [2000] [an eating or drinking club that regularly features adult activities in less than 40% of its floor area is not an "adult establishment" within meaning of 1995 Ordinance]).[2]

In light of the perceived continuing subversion of the 1995 Ordinance and the unforeseen textual ambiguities and limitations that had hamstrung its enforcement efforts, in March

---

**2.** Both *Les Hommes* and *Dezer* were enforcement actions centering on statutory interpretation. They were not facial constitutional challenges.

2001 the DCP filed an application for amendments with the CPC. The CPC in August 2001 issued a report that endorsed the proposed amendments, as modified after public hearings. As the CPC Report observed, it was anticipated in 1995 that the DCP "would report back to the [CPC] and the City Council on the effect of the [1995 Ordinance] in two years time following the start of enforcement and that the [CPC] would review at that time whether any modifications [were] needed."

The CPC Report stressed that the 2001 Amendments were "limited in nature" and did not alter the 1995 Ordinance's location restrictions. "Instead," they were intended "to clarify certain definitions in the [1995 Ordinance], in order to effectuate the [CPC]'s original intent," which was "to address those establishments similar in nature to the types of enterprises described and studied in the [1994] DCP Study, namely[,] book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities" (internal quotation marks omitted).

The CPC Report disclosed that as of 2000, 101 self-identified 60/40 businesses, including triple-X book and video stores, topless bars and strip clubs and theaters offering adult entertainment, operated in locations where adult uses were prohibited. Of these 101 businesses, 75 were preexisting establishments that assumed 60/40 configurations in response to the 1995 Ordinance; the other 26 opened after the 1995 Ordinance was adopted.[3]

At a public hearing on the proposed amendments in October 2001, Counsel to the Criminal Justice Coordinator for then Mayor Giuliani testified that the adult entertainment industry, unwittingly abetted by the courts' "misconstrued views and misconceptions," had exploited loopholes in the 1995 Ordinance, which "so distort the original law passed by the Council as to make it almost meaningless." Counsel to the DCP testified that the proposed amendments were designed to close these loopholes by "establish[ing] objective factors relating to the physical layout and method of operation" for adult bookstores and to overcome the "artificial separation of adult and non-adult sections" in adult eating and drinking establishments. Of the three

3. As is evident from these statistics, the 1995 Ordinance did not achieve its goal. We observed in *Stringfellow's* that the City expected the 1995 Ordinance to "lead to the forced relocation of some 84% of [its] 177 adult businesses" (*Stringfellow's*, 91 NY2d at 403).

Borough Boards that commented on the proposed amendments, Brooklyn and Queens approved and Manhattan opposed them. Of the 20 Community Boards that commented, 14 approved and five opposed the proposed amendments, and one voiced qualified opposition.

Relying on the 1994 DCP Study, the CPC Report and public testimony and comment, in October 2001 the City Council adopted the 2001 Amendments, which removed "substantial portion" from the definition of "adult establishment," leaving the following: "An 'adult establishment' is a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (NY City Zoning Resolution [ZR] § 12-10 [Adult Establishment] [1]).

The "substantial portion" standard remained in place for adult video and bookstores (id. [1] [a]). The 2001 Amendments provided, however, that nonadult material would not be considered stock for "substantial portion" analysis if the store's interior configuration and layout required customers to pass through an area stocked with adult material in order to reach nonadult material; there were any individual booths available for viewing adult movies or live performances; purchasing nonadult material exposed the customer to adult merchandise; nonadult material was for sale only, while adult material might be purchased or rented; more adult titles than nonadult titles were available; minors were restricted from the store as a whole or from any area offering nonadult material; signs or window displays promoting adult material were disproportionate to those promoting nonadult material, or to the proportion of floor space devoted to adult material; or "[o]ther features relating to configuration and layout or method of operation" which the Commissioner of Buildings may subsequently determine by rule "render the sale or rental of 'adult printed or visual material' a substantial purpose of the business conducted in such store," subject to "scheduled implementation" with respect to "commercial establishments in existence as of [the date of adoption], as necessary" (id. [2] [d] [ii]). The 2001 Amendments took effect immediately, although nonconforming establishments in existence as of August 8, 2001 were afforded a one-year amortization period, subject to further extension by the Board of Standards and Appeals (ZR § 72-41).

Plaintiffs brought these actions for declaratory judgment and injunctive relief in Supreme Court in the fall of 2002, just before

the expiration of the one-year compliance period for the 2001 Amendments. Plaintiffs For the People Theatres of N.Y., Inc. and JGJ Merchandise Corporation, also known as Mixed Emotions, brought the first action. For the People Theatres is a theater that regularly features adult films, purportedly in less than 40% of its customer-accessible floor space, and operates a separate area devoted exclusively to peep booths; JGJ is a video store that sells adult videotapes, purportedly as less than 40% of its stock and customer-accessible floor area. Plaintiff Ten's Cabaret, Inc., formerly known as Stringfellow's of New York, Ltd., brought the second action. Ten's is a cabaret that regularly features adult entertainment, purportedly in less than 40% of its customer-accessible floor space, as are plaintiffs Pussycat Lounge, Inc., Church Street Café, Inc., doing business as Baby Doll, and 62-20 Queens Blvd., Inc., which brought a third action that Supreme Court consolidated with the Ten's action. Plaintiffs Ten's and Pussycat successfully moved by order to show cause for a temporary restraining order pending decision.

Plaintiffs contended that they had made considerable investments and radically altered their operations in order to convert from adult establishments into 60/40 businesses, a new type of mixed-use enterprise that blossomed as a positive response to the 1995 Ordinance. They argued principally that the 2001 Amendments violated their rights of free expression under the state and federal constitutions because the City failed to support the regulations with a study targeted at the secondary effects of this new class of 60/40 businesses. Plaintiffs moved for a preliminary injunction preventing enforcement and plaintiff Ten's additionally moved for summary judgment; the City cross-moved for summary judgment.

On September 9, 2003, Supreme Court granted summary judgment to plaintiffs declaring the 2001 Amendments unconstitutional and enjoining their enforcement; and denied the City's cross motions. In the lead *Ten's* decision, Supreme Court concluded that the City could not ground the 2001 Amendments on the 1994 DCP Study because it did not address 60/40 businesses and therefore "cannot be used as evidence to demonstrate that these establishments cause secondary effects" (*Ten's Cabaret v City of New York*, 1 Misc 3d 399, 407 [Sup Ct, NY County 2003]; *see also For the People Theatres of N.Y. v City of New York*, 1 Misc 3d 394, 397 [Sup Ct, NY County 2003] [court "not persuaded that the 2001 amendments are narrowly tailored to limit free speech, without evidence that the 1995 Ordinance

was not effective in correcting the problems," and therefore searches the record and grants summary judgment to plaintiffs]).

On January 12, 2004, we sua sponte transferred appeals from *People Theatres* and *Ten's* (*see* 1 NY3d 590, 592 [2004]) to the Appellate Division, which consolidated them. On April 12, 2005, the Appellate Division reversed Supreme Court's judgments, on the law; denied plaintiffs' motions; granted defendants' cross motions; vacated the injunction; declared the 2001 Amendments constitutional; and dismissed the complaints. The Appellate Division subsequently granted leave and certified the following question to us: "Was the order of [the Appellate Division], which reversed the judgments of the Supreme Court properly made?"

## II.

*Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]), which was handed down after our decision in *Stringfellow's*, supplies the analytical framework for this appeal. *Alameda Books* elaborated on the Supreme Court's decision in *Renton*, on which we relied in *Stringfellow's*. In *Renton*, the Court upheld a municipal zoning ordinance restricting the location of adult movie theaters, based on studies in other cities showing the adverse secondary effects of adult uses. Questions arose after *Renton* in the lower federal courts, however, about the quality and quantity of evidence upon which a municipality may rely to substantiate that an ordinance regulating adult businesses is designed to serve a substantial government purpose; specifically, to ameliorate the deleterious social consequences flowing from adult businesses and not to infringe upon speech. The Court granted certiorari in *Alameda Books* to answer these evidentiary questions.

The dispute in *Alameda Books* derived from an ordinance enacted by the City of Los Angeles in 1978 to prohibit the establishment of adult businesses, defined to include bookstores and arcades, within 1,000 feet of another adult business or within 500 feet of a religious institution, school or public park. This ordinance was based on a comprehensive 1977 study of adult businesses in Los Angeles and its environs, which concluded that concentrations of these enterprises led to significantly higher rates of crime (prostitution, robbery, assaults and thefts) in the areas where they were located.

The ordinance included a provision detailing how the distance between adult businesses was to be measured, which allowed

distinct adult businesses operated under common ownership to be housed in a single structure. Concerned that this "loophole permitting the concentration of multiple adult enterprises in a single structure" might "defeat the goal of the original ordinance" (535 US at 431), which was to disperse these businesses, the City Council in 1983 amended the ordinance in two important ways. First, the amendments prohibited two adult entertainment businesses from being located in the same building; second, the amendments redefined an adult bookstore and an adult arcade as separate businesses regardless of whether they operated in conjunction with another adult business at the same establishment (*Alameda Books*, 535 US at 431).

Alameda and another adult business, both of which operated an adult bookstore and an adult arcade in the same building, sued for declaratory relief and an injunction on First Amendment grounds. The District Court granted plaintiffs summary judgment and issued a permanent injunction enjoining enforcement, determining that the ordinance was not content-neutral and did not withstand strict scrutiny because Los Angeles did not offer evidence that its prohibition served a compelling government interest.

The United States Court of Appeals for the Ninth Circuit affirmed, but on the basis that the challenged ordinance was invalid because Los Angeles had not presented evidence specific enough to support an inference that two adult uses in one building led to the same harmful secondary effects as two uses in neighboring buildings:

> "The [1977] Study treated a bookstore/arcade combination as a single business or unit of adult entertainment whose secondary effects arise from its proximity to several other units of adult entertainment. It did not analyze an individual bookstore/arcade combination as a concentration of adult businesses.

> "Additionally, the Study was not directed at determining the impact of individual adult entertainment business units. Rather, its purpose was to ascertain the impact of a concentration of such business units in small geographic areas. Therefore, by categorizing certain businesses as 'bookstore/arcades,' the Study determined not what the impact of a 'bookstore/arcade' was on the surrounding area, but

the impact of a bookstore/arcade as an individual business entity that was part of a concentration consisting of multiple adult business establishments. As such, the Study did not identify any harmful secondary effects resulting from bookstore/arcade combinations as individual business units" (*Alameda Books, Inc. v City of Los Angeles*, 222 F3d 719, 724 [9th Cir 2000]).

The Supreme Court reversed by a vote of 5 to 4, with Justice O'Connor writing for a plurality of four Justices, Justice Kennedy concurring in the result only, and Justice Souter writing for the dissent. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (*Marks v United States*, 430 US 188, 193 [1977] [internal quotation marks and citation omitted]). Thus, Justice Kennedy's opinion, and the relevant parts of the plurality opinion with which he agreed, are controlling on the issue of what a municipality must demonstrate in order to sustain a zoning ordinance regulating adult businesses in the face of a First Amendment challenge.

The precise question presented for review in *Alameda Books* was "whether the ordinance at issue [was] invalid because the city did not study the negative effects of such combinations of adult businesses [i.e., a combined adult bookstore and adult arcade], but rather relied on judicially approved statutory precedent from other jurisdictions" (*Alameda Books*, 535 US at 449 [Kennedy, J., concurring] [internal quotation marks omitted]). In the critical part of the plurality opinion, Justice O'Connor refers to *Renton* as a case in which the Court specifically "refused" to set a high evidentiary bar for municipalities "merely" to address the secondary effects of protected speech: "[w]e held that a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest" (*id.* at 438, quoting *Renton*, 475 US at 51). "This is not to say that a municipality can get away with shoddy data or reasoning" (*id.*). Instead,

> "[t]he municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evi-

dence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance" (*id.* at 438-439).

Justice O'Connor remarked that the case was "at a very early stage," Alameda and the other plaintiff having been granted summary judgment premised only upon "complaints that the 1977 study fails to prove that the city's justification for its ordinance is necessarily correct" (*id.* at 439). Accordingly, she concluded that Los Angeles "at this stage of the litigation" had complied with *Renton*'s evidentiary requirements (*id.*). Because the ordinance therefore survived the plaintiffs' motion for summary judgment, the Court reversed and remanded to provide the plaintiffs the opportunity to "demonstrat[e] that [Los Angeles]'s evidence does not support its rationale," or "furnish[ ] evidence that disputes [Los Angeles]'s factual findings" (*id.* at 438-439).

*Alameda Books* ratifies the message in *Renton* that a municipality's burden to prove that it has a substantial interest in regulating a particular adult activity is not a very heavy one. Indeed, the plurality flatly rejected the dissent's argument that a municipality was required to adduce empirical proof to demonstrate that secondary effects would, in fact, be ameliorated by the ordinance under consideration.

On the question of how much evidence was required to support an ordinance regulating adult businesses, Justice Kennedy agreed with the plurality that

> "[a]s to this, we have consistently held that a city must have latitude to experiment, at least at the outset, and that *very little evidence is required. . . .* As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion" (*id.* at 451-452 [citations omitted and emphasis added]).

In short, *Alameda Books* confirms that the reasonable discretion accorded most local legislative actions extends to adult use zoning. A local government implementing zoning that affects adult businesses must have a legislative record that establishes a substantial governmental interest in the subject matter of the regulation to justify restrictions on protected speech; however, the local government retains discretion to make its findings from studies or other supportive information before it, and to draw reasonable conclusions about which regulatory techniques will be most beneficial in addressing the findings. As the United States Court of Appeals for the Fifth Circuit summed up *Alameda Books'* deference to legislative judgments:

> "The point of deference is this: legislators cannot act, and cannot be required to act, only on judicial standards of proof. Legislative zoning decisions are generally upheld on a rational basis standard. Imposing a level of intermediate scrutiny . . . requires more conviction of the connection between legislative ends and means than does the rational basis standard, but only in the sense of 'evidence . . . [that] is reasonably believed to be relevant' to the secondary effects in question" (*N.W. Enters. Inc. v City of Houston*, 352 F3d 162, 180 [5th Cir 2003] [quoting *Alameda Books* at 442; *Renton* at 51], *cert denied sub nom. Ice Embassy, Inc. v City of Houston, Tex.*, 543 US 958 [2004]).

The facts here are very similar to those underlying *Alameda Books*. Like Los Angeles, the City seeks to tighten up a zoning ordinance regulating adult businesses in order to limit superficial compliance unanticipated when the ordinance was initially enacted. Like Los Angeles, the City seeks to rely principally on the same evidence of negative secondary effects that supported the original ordinance. Indeed, in Los Angeles's case, the original studies were 25 years old by the time the case reached the Supreme Court. Here, the City cites the 1994 DCP Study, already found to be sound in *Stringfellow's*, and its subsequent enforcement experiences to demonstrate that while many adult businesses may comply with the 1995 Ordinance, at least technically, their essential character remains unchanged. It is this essential character—as adult bookstores or adult video stores or strip clubs or topless clubs—that creates negative secondary effects. Given the very low *Renton/Alameda Books* evidentiary hurdle, we conclude that the City has satisfied its burden to

justify a secondary-effects rationale for the City's 2001 Amendments. Under *Alameda Books*, the question then becomes whether plaintiffs have demonstrated that the City's evidence does not support its rationale, or have furnished evidence that disputes the City's factual findings.

In this case, plaintiffs have disputed factual findings undergirding the City's 2001 Amendments. Plaintiffs For the People Theatres and JGJ have submitted the affidavits and reports of two experts, Dr. Elliott D. Sclar, an economist by training who is professor of urban planning and public affairs at Columbia University and a former member, by appointment of then Mayor Dinkins, of the New York City Economists Roundtable, Economic Policy Advisory Panel; and Dr. Charles Winick, a criminologist and, most recently, member of the graduate faculty at John Jay College of Criminal Justice, who directed a national survey for the President's Commission on Obscenity and Pornography. Both are widely published; Dr. Sclar has been recognized as an expert witness in state court and federal government proceedings.

Dr. Sclar performed a statistical analysis to ascertain whether the presence of 60/40 bookstores and theaters negatively affected property sales completed between 1998 and June 2002 by comparing the sales prices of real estate properties on blocks with these businesses with sales on nearby blocks. His analysis of approximately 1,000 sales transactions revealed "no statistically significant relationship between the presence of 60/40 uses and an adverse impact on adjacent property values." He concluded that the "presence of a 60/40 bookstore or theater within a specific area could not be linked to any weakening or decrease of property values within that area" (emphasis in original).

Dr. Winick studied whether there is any correlation between 60/40 bookstores or theaters and adverse consequences in the form of criminal complaints. His report was supported by material from the New York City Police Department's (NYPD) CompStat Unit, which collects and analyzes trends in felony complaints. He found a reduction of 23.9% in citywide felony complaints from 1998 through 2001; no 60/40 bookstores or theaters appeared on the NYPD's list of hot spots for crime; no relationship between prostitution arrests and these bookstores and theaters; and no correlation between any concentration of these bookstores and theaters in a precinct and the violent felony rate.

The remaining plaintiffs, who operate 60/40 cabarets, produced an NYPD report (February 2001), which showed crime statistics for all nightclubs in Patrol Borough Manhattan South. Of all the nightclubs in Manhattan which had any crime, the report listed only one topless club with two violations. They also presented NYPD documents entitled "Priority Listing of Problem Clubs" for various dates from mid-1998 through early 2000 in Patrol Borough Manhattan South, which similarly listed nonadult clubs almost exclusively.

Because plaintiffs have thus "furnish[ed] evidence that disputes the [City's] factual findings," the burden shifted back to the City "to supplement the record with evidence renewing support for a theory that justifies its ordinance" (*Alameda Books*, 535 US at 439). The City was not required, however, to relitigate the secondary effects of adult uses, or to produce empirical studies connecting 60/40 businesses to adverse secondary effects. The Supreme Court in *Alameda Books* rejected the argument that Los Angeles was required to conduct targeted empirical studies as a prerequisite for amending its existing adult use ordinance to regulate combined adult bookstores and adult arcades more closely. Nor did the Supreme Court in any way indicate that a municipality is somehow foreclosed from experimenting with its adult use regulations just because it may have already achieved some success in reducing negative social consequences.

The City justified the 2001 Amendments as a measure to eradicate the potential for sham compliance with the 1995 Ordinance, and thus to reduce negative secondary effects to the extent originally envisaged. There is no evidence in the record to suggest that the City adopted the 2001 Amendments for any other reason, much less to abridge free speech. In furtherance of its rationale for the 2001 Amendments, the City presented evidence of inspections conducted over three consecutive days in February 2001 of 12 self-identified 60/40 book and video stores within what appears to be a small area of Manhattan. This evidence supports the 2001 Amendments by indicating that these businesses, while they technically comply with the 60/40 formula, belong to the class of enterprises described and studied in the 1994 DCP Study—"book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities"—and linked to negative secondary effects. Thus, a triable question of fact has been

presented as to whether 60/40 businesses are so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects—as plaintiffs contend—or whether these businesses' technical compliance with the 60/40 formula is merely a sham—as the City contends.

In addressing this factual dispute, we anticipate that the City will produce evidence relating to the purportedly sham character of self-identified 60/40 book and video stores, theaters and eating and drinking establishments or other commercial establishments located in the city. This does not mean that the City has to perform a formal study or a statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city. If the trier of fact determines, after review of this evidence, that the City has fairly supported its position on sham compliance—i.e., despite formal compliance with the 60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit materials or activities, and thus their essential nature has not changed—the City will have satisfied its burden to justify strengthening the 1995 Ordinance by enacting the 2001 Amendments, and will be entitled to judgment in its favor. If not, plaintiffs will prevail on their claim that the 2001 Amendments are insufficiently narrow and therefore violate their free speech rights. In that event, plaintiffs will be entitled to judgment and a declaration that the 2001 Amendments are unconstitutional.

We have considered plaintiffs' remaining arguments, and conclude that they lack merit. Accordingly, the order of the Appellate Division should be modified, without costs, to deny defendants' motions for summary judgment; the matter remitted to Supreme Court for further proceedings in accordance with this opinion; and the certified question not answered upon the ground that it is unnecessary.

Chief Judge KAYE (dissenting). "New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community" (*Matter of Town of Islip v Caviglia*, 73 NY2d 544, 556 [1989]; *see also People ex rel. Arcara v Cloud Books*, 68 NY2d 553, 557 [1986]). Though our Constitution and decisional law robustly protect expressive conduct, unquestionably a municipality can regulate adult uses through its zoning

power. A regulation that infringes upon constitutionally protected speech or conduct, however, must be justified by unrelated concerns, and no broader than necessary to achieve its purpose (*Matter of Town of Islip v Caviglia*, 73 NY2d at 557-560).

We all agree that this standard was applied to the City's 1995 legislation. Where we differ is in its application to the City's 2001 legislation. The majority views the 2001 law as merely closing a "loophole" in the 1995 law, and concludes that the City therefore may rely entirely on the evidence it presented in support of the earlier law. We see it as a new law. The majority remits the case to Supreme Court for additional fact-finding; we do not see what additional facts could substantiate the new law that the City has not already had an opportunity to provide.[1]

We also disagree that *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]) sets the analytical framework for this appeal. In *Alameda Books* the problem the Los Angeles legislation addressed was the concentration of adult businesses, which led to demonstrably higher crime rates in areas where they were located. That goal was subverted when the businesses availed themselves of an exception in the law for common ownership and consolidated their operations in a single structure, thus becoming even more intensely concentrated and consequently even greater magnets for crime. The objective of the original legislation having been the same as that of the amendment, in defending the amendment against constitutional challenge Los Angeles was entitled to rely on the evidence supporting the original law.

Here, by contrast, New York City, responding to a proliferation of adult use businesses and related negative secondary impacts—including increased crime rates, lowered property values and deteriorated quality in neighborhood life—in 1995 for the first time adopted a zoning resolution to regulate businesses that devoted a substantial portion of their operations to adult entertainment. While the 1995 law defined an adult establishment as "a commercial establishment where a 'substan-

---

1. Indeed, it is not at all clear what the majority views as the triable issues of fact or, even more, what evidence, on remittal, could show that "the 2001 Amendments are insufficiently narrow and therefore violate [plaintiffs'] free speech rights" (majority op at 84). Plaintiffs have already shown the lack of any correlation between 60/40 operations and negative secondary effects and the City has not offered—and now apparently need not offer—anything to dispute that evidence.

tial portion' of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (1995 NY City Zoning Resolution § 12-10), in 2001 the City Council radically expanded its regulation, essentially extending the sweep of the law to businesses featuring adult entertainment "in any portion." The "substantial portion" requirement remains in place for book and video stores, but the definition of "substantial" has been significantly watered down. That is no mere clarification. That is a new law.

It is clear from this record that the City Council in 1995 set out to regulate only businesses that devoted a "substantial portion" of their space to adult entertainment. And from the very start, the City explicitly defined "substantial" as 40% or greater.

In its 1995 report, the City Planning Commission (CPC) addressed concerns that the word "substantial" was overly vague by explaining that the general intent of the adult use regulations was to monitor businesses that had "at least 40 percent of [their] accessible floor area used for adult purposes." According to the CPC, it was those 40% or more businesses that were the subject of the "establishments studied in the [1994 Department of City Planning] Study" upon which the rationale for the regulations rested. "As a general guideline," the CPC believed "that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an 'adult establishment' or 'adult bookstore.' "

Significantly, throughout years of litigation in state and federal courts challenging the constitutionality of the 1995 law, the City again and again emphasized that its regulation was designed to target the secondary effects only of establishments identified by the 1994 DCP study and the 1995 CPC report— those devoting 40% or more of their business to adult entertainment—and that its regulation was no broader than necessary. Key to the rulings upholding the 1995 law was that " 'all of the adult uses which would be covered by the proposed regulations have been shown to produce adverse secondary effects' " (*Stringfellow's of N.Y. v City of New York*, 91 NY2d 382, 401 [1998]).[2]

---

2. Shortly after the 1995 ordinance was upheld by this Court in *Stringfellow's*, the New York City Department of Buildings promulgated Operations Policy and Procedure Notice (OPPN) No. 4/98, which formally adopted the

In defending the 1995 law, both in constitutional and enforcement challenges, the City did not claim that *all* regulation of adult businesses was permissible but urged courts—this one included—to rely on its own 40% definition of "substantial portion" (*see City of New York v Dezer Props.*, 95 NY2d 771 [2000]; *City of New York v Les Hommes*, 94 NY2d 267, 273 [1999]; *City of New York v Show World*, 178 Misc 2d 812 [Sup Ct, NY County 1998]; *Hickerson v City of New York*, 932 F Supp 550 [SD NY 1996]; *see also Hickerson v City of New York*, 146 F3d 99 [2d Cir 1998], *cert denied* 525 US 1067 [1999]; *Buzzetti v City of New York*, 140 F3d 134 [2d Cir 1998], *cert denied* 525 US 816 [1998]).

Having intentionally limited the reach of its 1995 legislation to ensure that it did not "sweep too broadly" (majority op at 71), the City cannot now evade constitutional review of the preclusive 2001 statute by characterizing it as merely a clarification. The City was obliged to present *some* evidence demonstrating a nexus between the 60/40 businesses and the deleterious social effects supporting its 2001 regulation. The City cannot rely on the studies justifying the 1995 ordinance because the businesses within the reach of the 2001 law are different in character than those the City sought to regulate 10 years ago. While it produced voluminous evidence that the businesses targeted by the 1995 law were the source of deleterious negative secondary effects, the City has offered nothing of the kind here.

In contrast, in support of their motions for summary judgment, plaintiffs produced substantial evidence that the 60/40 businesses are functionally different from the pre-1995 businesses and that the 60/40 businesses do not produce negative secondary effects. The plaintiffs provided expert proof that property values increased in 60/40 neighborhoods on a par with those in the rest of the city after the 1995 resolution went into effect and that crime rates dropped in 60/40 precincts at the same or greater rate as in non-60/40 precincts after the 1995 resolution was enforced. Additionally, the plaintiffs offered evidence that many of the community representatives in areas with a heavy presence of 60/40 businesses who had supported the 1995 resolution now opposed the 2001 amendment.

It may well be that the City's earlier efforts to regulate adult businesses have proved ineffective, though the only evidence in the record is to the contrary. It may well be that broader regula-

---

40% definition. OPPN 4/98 was superseded a few weeks later by OPPN 6/98, which largely relied on the same 40% standard.

tion of adult entertainment is appropriate and would be sustained as constitutional. What is unacceptable is accomplishing that reform under the banner of the 1995 legislation, whose explicit purpose was a quite different one.

We would reverse the order of the Appellate Division and reinstate Supreme Court's judgments.

Judges ROSENBLATT, GRAFFEO and R.S. SMITH concur with Judge READ; Chief Judge KAYE dissents and votes to reverse and reinstate the judgments of Supreme Court in a separate opinion in which Judges G.B. SMITH and CIPARICK concur.

Order modified, etc.